## HATTEN, Rec., v. INTEROCEAN OIL CO. et al.

No. 27349. March 8, 1938.

Rehearing Denied April 19, 1938.

Roger Stephens, Howard B. Hopps, and Fred L. Hoyt, for plaintiff in error.

Everest, McKenzie & Gibbens, for defendants in error.

RILEY, J. This is an appeal from an adverse judgment in an action for an accounting by plaintiff in error against defendants in error.

The parties are in the same relation as in the trial court. For convenience the plaintiff corporation will be referred to herein as U. S. Cities and Roy Hatten, as receiver, will be referred to as the receiver. The defendant corporation will be referred to as Interocean and British American, respectively.

The matters involved include certain transactions with a corporation, not made a party, known as the Lorraine Petroleum Company, which will be referred to herein as the Lorraine.

The accounting sought involves the operation of two oil and gas leases in Creek county, known and herein referred to as the Deere and Barney leases.

In February, 1923. the Lorraine. being then the owner of the Deere and Barney leases, entered into a contract whereby it sold an undivided one-half interest in said leases to the U. S. Cities. This contract provided that the Lorraine should have exclusive control and management of said leases for the purpose of operating and developing same, and "shall render" (to U. S. Cities) "as soon as practicable after the first day of each and every calendar month * * * an itemized statement of the expense of operation during the preceding month," and further that the U. S. Cities would on or before the 18th of the month in which the statement was rendered pay to the Lorraine one-half of the cost and expenses of operation and developing said lease for the month covered by such statement.

The leases were not fully developed at that time, and Lorraine thereafter developed and operated the leases under said contract until about November 1, 1923. It appears that some differences arose between the parties during that period, and in addition thereto it appears that the U. S. Cities had mortgaged or pledged its interest in said leases to the American National Company, to secure certain indebtedness. On the latter date an agreement was entered into between the three parties, Lorraine as first party, U. S. Cities as second party, and American National Company as third party, which agreement after certain preliminary recitals, provided:

"Whereas, certain differences have arisen between said first and second parties as to the operations of said oil and gas mining leases, the expenses incident thereto and the sale by first party of oil produced thereon, and the amount owing by second party to first party on account of the expenses of operation since the ___ day of _____, 1923, and

"Whereas, said second party has heretofore caused to be assigned to the American National Company, the third party as of the ___day of _____, 1923, the undivided one-half interest of the second party in and to said leases and the production thereon on and after said ___day of _____, 1923, to secure certain indebtedness of said second party evidenced by certain instruments in writing and question has arisen

between said first party and third party as to the priority of the respective claims and demands of the said first party against the second party on account of expense of operation and the holders of said indebtedness secured by assignment to the American National Company, as aforesaid, and

"Whereas, said parties have agreed to settle all matters of differences as herein provided, now therefore this contract witnesseth,"

The contract then set forth a statement of the balance due the Lorraine from U. S. Cities as the purchase price of its one-half interest in the leases, with certain contingent deduction depending upon the payment of certain trade acceptances, by a third party, and further deductions representing one-half interest in certain oil then in storage, which Lorraine agreed to purchase at a stated price.

The agreement then provided:

"Second. That first party will prosecute operations for the production of oil and gas upon said described leases and undertake to dispose of the production thereon to the best advantage possible, and further agree that it will purchase all of the oil produced thereon to the credit of the working interest and not sold to pipe lines at the price of sixty cents (60c) per barrel for the period of sixty days from Seven A. M. (7 A. M.) of this date, and thereafter until the expiration of thirty days from and after notice in writing by first party given to second party, after expiration of said sixty days, and further agrees that it will account to the third party semi-monthly for the oil so purchased less one-half of the current costs of operations (to be deducted monthly) and less any amount then due and owing by the second party to the first party on account of the indebtedness aforesaid. Nothing in this paragraph shall entitle said first party to continue the purchase of said oil at the price of sixty cents (60c) per barrel in event a reliable purchaser thereof for a greater price can be obtained, said first party having notice thereof, in writing and having opportunity to make such sale, provided said first party may continue to purchase such oil upon paying the price so otherwise obtainable."

The contract then provided for the disposition of the proceeds of oil sold to purchasers other than the Lorraine until the amount due from U. S. Cities should be paid in full. And finally:

"It is mutually understood and agreed that this contract shall be binding upon the parties hereto, their respective successors and assigns. and that when signed and delivered shall become conclusive evidence of settlement of differences between the parties hereto concerning the matters herein set forth. arising prior to this date, except as to the obligations and agreements herein set forth."

Lorraine thereafter operated the property until about July 1, 1925, and so far as this record discloses the indebtedness due the Lorraine from U. S. Cities was fully paid during that period, but U. S. Cities was still indebted to the American National Company in a large sum.

On July 1, 1925, Lorraine entered into a contract with Interocean whereby Lorraine sold to Interocean certain of its property, including its interest in the Deere and Barney leases, with all equipment, machinery, tools, etc., located thereon. No mention was made in this contract of the arrangement with U. S. Cities and American National Company, or their interest in the property.

This contract provided that "all expenses, taxes and other charges in connection with the operation of all of said properties hereby purchased and sold, shall be adjusted between the parties as of October 1, 1925."

On October 1, 1925, Interocean took over possession and operation of the Deere and Barney leases and operated same apparently under the same arrangements as had theretofore existed between Lorraine and U. S. Cities and American National Company.

Differences arose between U. S. Cities and Interocean concerning the operation of the property, and on September 7, 1928, this action for an accounting was commenced by the U. S. Cities against Interocean. The petition set out in substance the arrangement with the Lorraine, and alleged that the Interocean succeeded to the rights of Lorraine and that thereafter said arrangement was continued and that the Interocean had thereafter continued to superintend and control the operation of said property selling the oil and gas therefrom and paying the expenses, but had failed and refused to pay to plaintiff the one-half of the net proceeds of such sale, and had been fraudulently purchasing supplies not intended for use on said leases and charging same to the operation of the Deere and Barney leases, and had been claiming and retaining large sums of money for management and superintendence of said leases which were not due to defendant and which it had no authority to charge against the income from said leases, and also that defendant had disposed of personal property belonging to said leases

or had converted same to its own use and refused over the demands of plaintiff to account therefor or to pay for same.

Interocean answered admitting that it was the successor of the Lorraine; that plaintiff and defendant were the owners in common of the oil and gas leases described in plaintiff's petition, and that defendant was operating said leases under agreement between the parties. It placed and set up as exhibits to its answer the original contract between Lorraine and U. S. Cities and the tri-party agreement of November 1, 1923, between Lorraine, U. S. Cities, and American National Company, "providing for the settlement of certain differences between plaintiff and defendant." It then alleged a purported settlement and adjustment of differences between plaintiff and defendant and the American National Company as to the charge for so-called overhead, whereby said charges were, on about December 14, 1927, reduced from $275 per month to $200, and then pleaded generally that it had well and truly accounted, and had made full, true and complete accounting from time to time, together with remittances to both plaintiff and its assignee, the American National Company, attaching alleged copies of said reports from October 1, 1925, to the date of the then last report, dated August 31, 1928.

Thereafter, on December 30, 1929, Interocean and two other Delaware companies entered into a contract with British American whereby British American purchased all of the interest of Interocean in and to the Deere and Barney leases.

Thereafter British American took over possession, control, and management of the property and continued to operate same apparently under the original agreement between Lorraine and U. S. Cities.

Some time prior to February 12, 1930, U. S. Cities was placed in the hands of a receiver, Roy Hatten being the receiver at that time. On said date he was substituted for U. S. Cities as plaintiff in this action, and was given leave to file an amended petition wherein the alleged improper charges, etc., were more particularly set forth and certain items were set up as having arisen during the period Lorraine operated the leases, and further allegations were made to the effect that the arrangement between Lorraine and U. S. Cities constituted a mining partnership property for such sums · as might be found due plaintiff upon a proper accounting.

November 18, 1932, a supplemental petition was filed wherein British American was made a party defendant, and the claims of plaintiff were set out in more detail and substantially the same allegations of failure to properly account were made against the British American during its period of operation. Thereafter in June, 1933, an amendment to the supplemental petition was filed wherein a long itemized list of alleged improper charges, deductions. misapplication of property, etc., was set out.

Thereafter the Interocean and British American filed their joint answer in which they each specifically denied any liability on account of any claim arising during the Lorraine period of operation and each alleged a full, true, and correct accounting during their respective periods of operation, and again set out and referred to the several contracts, agreements, etc., copies of alleged monthly statements made during the British American period of operation were attached and in effect said companies alleged that the statements of account by them rendered as alleged were or had become stated accounts and that each monthly statement had been accepted by plaintiff without serious objection and had thereby become accounts stated so that plaintiff was not entitled to a further accounting.

Reply was made to this answer, in substance, denying generally the correctness of the alleged accounts rendered. and specifically denying that the accounts so rendered had been agreed to or had become accounts stated, and further alleged that the accounts so rendered invariably included therein certain false, fraudulent, fictitious, and unauthorized charges or claims, etc.

The pleadings cover some 143 pages of the record, and cannot be set out at length. It appears that the Lorraine, Interocean, and British American were all Delaware corporations, and had for the most part substantially the same officers and directors.

With the issues thus joined the cause came on for trial on April 8, 1935. A jury was waived and the cause was tried to the court.

At the beginning the trial court made the following ruling:

"The Court: The court holds, as a matter of law, under the pleadings in this case, the burden of proof is on the plaintiff to establish any duty on the part of the defendants in this case to account as to any obligations due to the Lorraine Oil

Company prior to October 1, 1925, except as disclosed by the pleadings.

"The court further holds that the burden is on the defendants to account or to show from the evidence accounts stated, the time for which shall be established or hereafter determined."

Thereupon the plaintiff, after excepting to the ruling of the court as above set out, proceeded with its evidence, apparently intended to show a duty on the part of defendants to account as to "any obligations due plaintiff arising out of the period of Lorraine operation." At the close thereof, defendants demurred to the evidence as not being sufficient to establish any right of plaintiff to prosecute this action as against defendants in so far as it might involve the interest, liability, or rights of Lorraine prior to October, 1925; and for the further reason that Lorraine had never been made a party to this action, and that plaintiff had failed to prove in any way any assumption of liability on the part of Interocean or British American. The court withheld ruling on the demurrer, expressing doubt as to whether in any equity case, such as this, a demurrer would lie as against a part of plaintiff's case, and that the court had a right in equity cases to hear all the evidence before making a ruling on any part of it. At this point defendants asked leave to file their supplemental answer, to which plaintiff later filed its reply. Thereafter further evidence was introduced by which defendants sought to establish their claim of accounts stated.

At the close of all the evidence the trial court made extensive findings of fact, basing his judgment thereon. Judgment was against plaintiff as to all its claims, and plaintiff appeals.

Nine assignments of error are set up in the petition in error. In the brief error is presented under three assignments or propositions:

(1) That the court errred in holding that the monthly statements rendered by defendants had become accounts stated, that plaintiff was therefore not entitled to an accounting.

(2) That the trial court erred in refusing to impress a lien on the Deere and Barney leases for the amounts shown by plaintiff and admitted by defendants to have been owing by the Lorraine at the close of its period of operations, and

(3) That the court erred in refusing to render judgment for the amounts due U. S. Cities from Interocean.

The first proposition requires consideration, to some extent, of the law and procedure of accounting in an action brought for that purpose. But first the relationship between the parties is to be considered.

It may be stated that from the pleadings and evidence it appears clear that during all the time after the U. S. Cities purchased its one-half interest in the oil and gas leases or property known as the Deere and Barney, there existed between the U. S. Cities and the owners of the other one-half interest a species of partnership known as a mining partnership with the Lorraine, Interocean, or the British American, as the case might be, acting as what is termed the operating partner, and U. S. Cities being what is termed as a nonoperating partner.

One difference between a mining partnership and an ordinary business partnership is that the sale or transfer by one partner of his interest in the venture in a mining partnership, with or without the consent of the remaining partner or partners, does not dissolve the partnership, as it does in case of an ordinary business partnership.

It is generally held that "the law governing general copartnerships with a few well-defined exceptions (one of which is noted above) applies to mining copartnerships." Dellapiazza v. Foley (Cal.) 44 P. 727.

The duty, then, of an operating partner to account to a nonoperating partner applies to a mining partnership the same as to a general business partnership.

It is generally held that it is the duty of a partner who manages, conducts, or operates the partnership business to render accounts of his management of the business and, acting as a trustee for the firm, he must render full, exact, and true account of all transactions to his partner or partners. Each partner should be charged with everything which he should justly pay or account for to the firm, and credited with everything which the firm as a distinct entity should pay or account for to him.

The original agreement between Lorraine and U. S. Cities required this of Lorraine. The same duty was cast upon Interocean and British American, respectively, when and after they became managing partners.

The question then arises whether such accounts rendered are or may become ac-

counts stated, and if so, under what facts and circumstances they are or may become accounts stated.

If such an account rendered becomes an account stated, it is then final and may not, with certain exceptions, such as, for fraud or mistake, be opened. It is, with exceptions noted, thereafter conclusive and binding upon the party to whom it was rendered.

"An account stated is an agreement between parties who have had previous transactions of a monetary character that all the items of the account representing such transactions, and the balance struck, are correct, together with a promise, express or implied, for the payment of such balance." 1 C. J. 678.

In Williams v. Casparis Bros., 113 Okla. 51, 238 P. 438, an account stated is defined as:

"An account stated is an agreement, expressed or implied, between parties who have had previous transactions with each other, fixing and determining the amount due from one to the other on account, and when such agreement is made, such 'account stated' becomes a new obligation, and takes the place of the one upon the prior account."

A similar definition is given in Harrison v. Henderson (Kan.) 72 P. 878.

It thus appears that the agreement fixing and determining the amount due from one party to the other may be express or implied.

"In stating an account, as in making any other agreement, the minds of the parties must meet." 1 C. J. 685.

An account stated must be made with knowledge on the part of the party to whom the account has been rendered, of all the circumstances, else he will not be bound thereby. 1 C. J. 686.

The record in this case discloses that during the entire period of operation by the Interocean and British American, monthly statements were rendered by the operating partner to the U. S. Cities, either directly or to the American National Company, its assignee. The latter company was security for indebtedness from the U. S. Cities to the Lorraine. These accounts were for the most part itemized or had attached thereto invoices showing purchase of supplies, etc., for use in operating the Deere and Barney leases. During this period when the accounts rendered showed a balance due U. S. Cities, a check for such balance was sent along with the account, except that during a portion of the time payment was withheld on account of certain claims made against U. S. Cities by the state for the payment of gross production tax on the one-half of the oil produced representing the share of U. S. Cities. This claim was adjusted and settled and all the balance that had been withheld represented to be due to U. S. Cities was paid at one time.

There is no evidence whatever of an express agreement as to the correctness of any of the accounts so rendered. If any of the accounts so rendered became stated accounts, it must have been so under the rule of implied agreement. That is: "Where an account is rendered by one person to another, the retention of the same by the latter beyond a reasonable time without objection is evidence of his assent to the correctness of the account; and accordingly is evidence of an account stated." 1 C. J. 691.

It is said that a majority of the cases hold that where the person receiving the account retains it beyond a reasonable time without objection, this fact, if unexplained, establishes an assent to the correctness of the account; and a promise to pay the same, and so establishes an account stated. Ibid. Thus an implied agreement to correctness of the account is established.

It is apparently this rule that defendants rely upon and which the court applied in finding and holding as it did, as follows:

"The court further finds that the furnishing of statements each month to the plaintiff, or its receiver as the nonoperating partner in the Barney and Deere leases of the expenses of operation constitute accounts rendered each month and accounts stated between said parties in so far as the operations to this date are concerned, there being no clear or convincing objections to the same."

We are cited to no authorities which hold that objections to an account in order to prevent its becoming an account stated must be clear and convincing. The court did find that there was some evidence of complaints made during 1925 and 1926, in respect of certain items claimed to be overcharges, etc.

The evidence discloses that as to one particular item or charge there had always been a controversy and objection thereto had repeatedly been made before this action was commenced and during the period of the operations by Interocean.

The record discloses that during the entire time a charge was made against U. S. Cities for what was termed "overhead expense." That is explained as being a charge in addition to the actual expense incurred, directly on the leases in producing the oil, such as material purchased, salaries and wages paid to the necessary employees, including a superintendent, etc., that is, a charge made for office expense such as 'bookkeeping, etc. At first this charge was in the sum of $275 per month. After some controversy about the matter and numerous complaints this charge was, about January 1, 1928, reduced to $200 per month except for one month when it was $225.

This charge had been more or less vigorously protested all the time. Complaints were also made from time to time as to alleged excessive expense in producing the oil, but no specific items appear to have been mentioned.

The item of "overhead" was protested because there was no provision in the contract justifying such a charge. But a sample of one of the objections is shown in a letter to Interocean dated December 12, 1928, from Wilson & Wilson, attorneys for a Mr. Vose, a mortgagee of the U. S. Cities, to whom payment by U. S. Cities share of the net proceeds of the oil produced was being paid in liquidation of his mortgage. This letter (C.-M., p. 817) stated:

"Our clients, Mr. Vose and the First National Bank have received your accounting for the last half of November, with enclosed check for $333.75. * * *

"We have written you quite often about our objection to the deductions you are making and this is positively beyond all reason. We have heretofore told you we took exceptions to the $200.00 a month overhead as not being justified under any known contract.

"It is my information, and I so state on information and belief that our company is operating other properties and you are in the habit of buying new supplies for these leases, and whenever you need them somewhere else you take them to your properties, and when they are needed on these leases you buy new ones and never make any accounting of any kind to us for our one-half interest in such supplies. Suffice it to say, some day in some place we are going to demand an accounting from you by the courts, if we cannot get it any other way, for these outrageous deductions and charges."

Another letter to British American (C.-M.-812) dated September 1, 1930, contained the following:

"In company with Mr. Everitt and his Auditor, we noted the continuation charge of $200.00 for overhead, and one month we find you made this charge $225.00. We have heretofore advised you that under the existing contract between the U. S. Cities Corporation and your company, this overhead charge was unjustified. Mr. Everitt and his Auditor have confirmed this."

In addition there was evidence of a number of conversations between Mr. Snedden, the vice president and manager of the operating companies, and representatives of U. S. Cities, its mortgagees or assignee, in which this item or charge was vigorously protested. It may be noted that the principal ground upon which objections were made was that this charge or any charge on account of so-called "overhead" was not authorized by the contract. But at the trial there was evidence tending to show that a reasonable charge, if any, is properly chargeable, for this "overhead" was not to exceed $125 per month. In fact, the uncontradicted evidence is that the operating companies, Interocean and British American, charged their own interest in said leases with but $125 per month for such "overhead."

Other items were also assailed. There is some evidence tending to show that at least one of the operators had bought certain supplies for the Deere and Barney leases, and charged U. S. Cities interest with one-half of the list or invoice price thereof, when in fact they were given certain discounts from the list price, all of which the operating partner retained. These particular items, however, were never pointed out or objected to before this action was commenced, apparently because U. S. Cities or its representatives had no knowledge of such charges until they were revealed by an audit made after the controversy arose. But it is clear that more or less vigorous protests were made from time to time as to the general alleged excessive costs or operating expenses charged against U. S. Cities.

There was evidence on the part of defendants from their auditors and other agents who were in the office that no objection or protest to or against any of the accounts were ever called to their attention. But evidence is that said objections and protests as were made were made to Mr. Snedden, the vice president and general manager of the Interocean and British American, during his lifetime. He died sometime in 1934, before the trial of this case.

There being no evidence of an express agreement as to the correctness of the several accounts as rendered, we hold that if accounts rendered as these were may under the law become stated accounts under the implied agreement rule, the finding of the trial court to the effect that such accounts did become and were stated accounts cannot be sustained. The great weight of the evidence is to the contrary.

Again the contention is made that any accounts rendered after the commencement of the action, September 7, 1928, could not ripen into accounts stated under the implied agreement doctrine.

In somewhat similar circumstances in Curry v. McKenzie, 239 N. Y. 267, 156 N. W. 375, it was held:

"Debtor did not assent to items by failure to object on receipt of bill of items, where parties were in litigation at such time or within a few days thereafter."

Therein it was said:

"In such circumstances the defendant's silence when the bill reached him through the mails could not reasonably be interpreted by the sender as an expression of assent. * * * The lines of battle had been drawn and the contest had begun."

It must be borne in mind that plaintiff in the original petition alleged that defendants had been claiming as a matter of right large sums of money for management and superintending of the leases which they had no right or authority to charge against the income from said leases. While the specific item of alleged "overhead" was not mentioned in the original petition, that item had been in controversy for sometime, and it could hardly in justice be said that plaintiff had, by its silence, if it had in fact remained silent as to said accounts, agreed to the correctness of said accounts after the suit had been commenced, when at the time it was contesting similar charges in court.

Defendants contend that by the triparty agreement of November 1, 1923, the right of the operating partner to charge for "overhead" in the amount shown by the evidence was fixed and agreed to by the U. S. Cities, and became binding on the parties, their successors and assigns.

This is not true for two reasons: First. There is nothing in the triparty agreement concerning the question of charges for "overhead," and nothing therein tending to show

that particular item had been a subject of controversy prior to the date of the agreement. And second. The agreement itself provides that it is only a settlement of differences between the parties concerning matters therein set forth arising prior to the date thereof. It purports to be a settlement of their differences down to that date, and makes a specific provision for the sale of the oil thereafter produced, and fixed as near as possible the balance then due from U. S. Cities on account of the purchase price of its interest in the leases and provides for the payment thereof, as well as the payment of the amount it owed American National Company.

As to accounts rendered to plaintiff Hatten after his appointment as receiver for U. S. Cities, by the federal court, about February 9, 1929, failure by him to object did not create accounts stated, in the absence of a showing of notice to the court appointing him or its notification or approval thereof. 1 C. J. 724.

The second proposition, assignment No. 4, is that the court erred in refusing to impress a lien upon the Deere and Barney leases (the partnership property) for the amounts shown and admitted by defendants to have been owed by the Lorraine during its period of operation.

There is no clear admission by defendants of any amount due from Lorraine, with the possible exception of the sum of $317.79. In one of the answers of defendants they do admit that an audit which they had made showed the errors had crept into the accounting to the extent of $317.79.

The record discloses, and an analysis of the audit referred to, attached to said answer, further shows items, questionable in the view of the auditor, had been charged to U. S. Cities by the Lorraine in the matter of discounts taken by Lorraine on supplies, etc., purchased for use in the Deere and Barney leases, aggregating $2,186.55, and that reconcilement of the books with statements rendered showed a further credit due U. S. Cities from Lorraine in the sum of $3,947.41.

The record discloses that sometime after this controversy arose defendant British American or British American and Interocean employed an auditing firm to audit the books, etc., as to the transaction between U. S. Cities and Lorraine. This audit is referred to in the record as the

Ligon audit. It was paid for out of a fund of $75,000, set aside and placed in escrow out of the sale price of the Interocean to British American as a guaranty of settlement of all claims and indebtedness of the Interocean at the time of the transfer to British American.

These alleged errors and credits did not appear in the audit and analysis which was attached to the answer. The audit was introduced in evidence and its correctness was not challenged. So far as this appeal is concerned, it will be treated as correct. Therefore it may be said, since it is not denied, that the evidence shows that Lorraine was apparently indebted to U. S. Cities, at the time it sold to Interocean, in the sum of approximately $6,451.75, made up of the errors admitted, the alleged wrongful retention of discounts, etc., and other matters referred to in the audit. However, it is admitted that a part of the items may have arisen prior to November 1, 1923, the date of the triparty agreement referred to above. There is, of course, a possibility that such items may have been included in the settlement, but certainly not the "errors" that "crept" in.

Lorraine was not made a party to this action, and that was one of the reasons assigned by the trial court for holding for defendant on these items. The question then is whether, conceding the items to be due, it was necessary to make the Lorraine a party defendant in order to settle the question of liability as to these items.

It is in effect conceded that a mining partnership existed between U. S. Cities and Lorraine from the beginning of the transaction here involved.

Sturm v. Ulrich, 10 F.2d 9, is a case which arose in Carter county, decided by the Eighth Circuit Court of Appeals while Oklahoma was still in that circuit. It involved a mining partnership. With reference to the nature of such partnerships it is therein said:

"Such a partnership has many of the attributes and limitations of an ordinary partnership but not all such. There are some cardinal differences. Probably, the main differences are that the death or bankruptcy of one such partner does not terminate the partnership and that one partner may convey his interest, or any part thereof, without the consent of his associates and without terminating the partnership and the transferee thereof becomes a partner, to the extent of the interest trans-

ferred, from the effective date thereof. Mining partnerships are held, generally, to be applicable to development of oil and gas properties—Pennsylvania being the exception. Such relationship in this regard is recognized in Oklahoma. Where a mining partnership exists, each partner is liable to the others for his share (depending upon his interest) of the expenses and losses incurred in the enterprise and there is a lien for such upon his interest in the property or proceeds therefrom in favor of creditors or of other partners who have made advances."

That case decides virtually every question involved in this phase of the action save one. That is, whether in case of a mining partnership the nonoperating partner is entitled to a lien on the whole of the mining partnership property for his share of the profits received and retained by the operating partner, and if so, does this lien extend and apply to the share of the operating partner retaining such profits after the sale thereof to a third party? There is no question as to the lien so operating if it be for advances made or a lien of creditors. It is everywhere so held.

There appears to be no separate statute in this state as to mining partnerships on the subject.

In 40 C. J. 1151, is found the following with reference to mining partnerships:

"Each member of the mining partnership has a lien upon the partnership property for the debts due the creditors of the partnership, and for moneys advanced by him for its use which he may enforce in equity without any previous agreement among the partners that such lien shall exist, but has no lien for his share of the profits, or where expressly excluded by contract."

As to advances made by one member of a mining partnership, Kennedy v. Beets Oil Co., 105 Okla. 1, 231 P. 508, holds:

"A member of a mining partnership who advances more than his share of the money to operate or develop oil lands has a lien on his partner's share to the extent of his over-advancement on final accountings."

That also points out the principal distinction between a mining partnership and an ordinary partnership.

The case cited in support of rule laid down in 40 C. J. 1151, supra, is G. V. B. Mining Co. v. First Nat. Bank, Brown et al., 95 Fed. 35. It was there held:

"The law of mining partnerships, as declared by the courts or by the statutes of

Idaho, does not entitle a mining partner to a lien on the product of a mine for his share of past profits made by his partners while he was excluded from the property, as against a mortgagee of the interests of such partners, although he will be entitled to his share of the product while the mine is operated by a receiver appointed in a suit to foreclose the mortgage."

It is noted that the decision in that case is based upon the provision of an Idaho statute. The applicable section is:

"Each member of a mining partnership has a lien on the partnership property for the debts due the creditors thereof, and for money advanced by him for its use. A lien exists in favor of the creditors notwithstanding there is an agreement among the partners that it must not." Rev. Stat. 1887, sec. 3303.

It is claimed that Harris v. Young, 298 Ill. 319, 131 N. E. 670, adheres to or follows the rule announced in G. V. B. Mining Co. v. First Nat. Bank, Brown et al.,, where no similar statute is referred to.

No statute on the subject applying to mining partnerships as such exists in this state. The law of accounting as to general partnerships appears to have been applied to accounting as between partners in a mining partnership. Kennedy v. Beets Oil Co., supra.

The right to a lien is governed by section 11630, O. S. 1931, which provides:

"Each member of a partnership may require its property to be applied to the discharge of its debts, and has a lien upon the share of the other partners for this purpose and for the payment of the general balance, if any, due to him."

Betts v. Letcher, 1 S. D. 186, 46 N. W. 193, is a case where the identical question here under consideration was involved. It was there held under a statute identical with ours that the right of a partner extended to a lien on the partnership property for profits due one partner and withheld by another.

Duryea v. Burt, 28 Cal. 569, is a rather early case in the West, dealing with the law of mining partnership, and cited in G. V. B. Min. Co. v. First Nat. Bank, supra, in discussing the rights of incoming partners in mining ventures. It is therein said:

"They must therefore be deemed to have taken the property cum onere, subject to an adjustment of the account between the partners and the payment of the partnership debts, and also of the amount due the plaintiff on the partnership account."

The only case construing a statutory provision like section 11630, O. S. 1931, cited or called to our attention, is that of Betts v. Letcher, supra, unless it be that of Martin v. Carlisle, 46 Okla. 268, 148 P. 833. The opinion as reported in the latter case does not fully disclose where or on what account the judgment of $424 arose, but it is apparently for the plaintiff's share of the reasonable value of the use of the partnership property after transfer of the one-half interest therein to a third party. It does not appear, however, from the opinion whether a lien on the plaintiff's interest was allowed for the judgment against Martin.

Under the provisions of section 11630, O. S. 1931, and the authorities cited, we hold that in this state the right to a lien by one partner on the partnership property extends not only to debts due creditors and for money advanced by him for partnership use, but also for the payment of any general balance, if any, due him.

The incoming partners, Interocean and British American, each in turn as they became partners took the interest they acquired in the partnership property cum onere subject to an account between partners and the payment of partnership debts, and also the payment of the amount due the nonoperating partner on the partnership account. As to the latter it is admitted that there was at least $317 due from Lorraine to U. S. Cities at the time Lorraine went out and Interocean came in as a partner. Upon a final proper accounting this amount may be increased. No personal judgment therefore can be rendered against either Interocean or British American, but a lien against the one-half interest in the two leases now owned by British American for its payment is proper.

The contention is made that no such lien may be enforced without having made Lorraine a party. This certainly is not true as to any amount admitted to be due. Nor do we think it necessary to make Lorraine a party in order to fix a lien for other amounts found to be due plaintiff, unless personal judgment is sought against Lorraine. It is generally held that an owner of property against which a lien is sought who has parted with all his interest therein need not be joined, unless a personal judgment against him is sought. 40 C. J. 401.

The general rule where a subcontractor asserts a lien for labor or material, in the absence of a statute requiring same, the

original contractor is not a necessary party. 40 C. J. 405.

Furthermore it may be noted that the question of alleged defect of parties defendant was not raised in the trial court by demurrer, answer, or otherwise. Where such defect of parties plaintiff or defendant appears upon the face of the petition, the question may be raised by demurrer. Section 201, O. S. 1931, subdivision 4. Where the defect does not appear upon the face of the petition, the objection may be taken by answer. If no objection be taken, either by demurrer or answer, the defect is waived. Section 203, O. S. 1931; Culbertson v. Mann, 30 Okla. 249, 120 P. 918; Tudor v. Am. Investment Co., 163 Okla. 274, 21 P.2d 1056.

At the close of the evidence, and after the trial court held that the accounts rendered by the defendants were or became stated accounts, plaintiff was given time in which to elect in writing to surcharge the accounts of defendants or either of them, and was granted time in which to file proper pleading for that purpose. Plaintiff declined so to do. It is suggested that by this refusal plaintiff may be precluded from further attacking said account. The effect of the ruling of the court and the order allowing pleading seeking to surcharge the account was to place the burden upon plaintiff to plead and prove fraud or error in the accounts.

Since we have held that the trial court erred in holding that the accounts so rendered were or became accounts stated, it follows that the court erred in casting this burden upon plaintiff. Plaintiff is within his rights in appealing from the ruling and judgment of the trial court.

Plaintiff is entitled to an accounting, and the judgment is reversed and the cause is remanded for further proceedings consistent with the views herein expressed.

OSBORN, C. J., and CORN, GIBSON, and DAVISON, JJ., concur.