In re Kenneth L. EAMES, and Polly H. Eames, Debtors.

YELLOWSTONE VALLEY PROPERTIES, A Montana general partnership, and Safeco Insurance Company of America, Plaintiffs,

v.

Kenneth L. EAMES, Defendant.

Bankruptcy No. 89–10378–007.
Adv. No. 289–0072.

United States Bankruptcy Court,
D. Montana.

Jan. 9, 1990.

Neal G. Jensen, Great Falls, Mont., U.S. Trustee.

Craig D. Martinson, Billings, Mont., interim Trustee.

Jerrold L. Nye, Nye & Meyer, P.C., Billings, Mont., for debtors.

Greg A. Luinstra, Great Falls, Mont., for Safeco Ins. Co. of America.

Joel E. Guthals, Wright Law Firm, Billings, Mont., for Yellowstone Valley Properties.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 7 case, Yellowstone Valley Properties, a co-partnership, and Safeco Insurance Company of America have filed a complaint against the Debtor, Kenneth L. Eames, seeking a determination that the debt owed each creditor is non-dischargeable under Section 523(a)(4) and (6) of the Bankruptcy Code. The parties have submitted the matter on an agreed statement of facts which center around state court findings and judgment entered in favor of the objecting creditors.

The stipulated facts are identical to the findings of fact entered by the state district court described above and are as follows:

### STIPULATED FACTS

1. That Defendant, Kenneth L. Eames (hereinafter referred to as "Eames"), was at the times and for the purposes pertinent herein a duly licensed real estate salesman pursuant to Title 37, Chapter 51, M.C.A.

2. That at all times pertinent herein, Eames was the managing partner and attorney-in-fact for the Plaintiff, Yellowstone Valley Properties, a Montana general part-

nership, (hereinafter referred to as "YVP").

3. That YVP was formed to subdivide and sell single-family residential property located in Hypark Subdivision, such subdivision being in Yellowstone County, Montana.

4. That YVP entrusted Eames to advertise for, locate, negotiate with prospective purchasers, and to sell developed single-family residential lots on behalf of YVP, and YVP agreed to pay Eames a commission for such services.

5. That on or about August 11, 1981, Eames, on behalf of YVP, negotiated and ultimately executed a contract for YVP with Design Builders, Inc., for the purchase by Design Builders, Inc., of ten (10) YVP lots within Hypark Subdivision, First Filing, for the sum of $180,000.00.

6. That over the course of the next four years, Eames received from Design Builders, Inc., a total of $213,660.00 toward the purchase of the aforedescribed lots.

7. That with respect to such sale, Eames earned and collected the sum of $15,000.00 as a commission.

8. That of the total funds received, Eames applied $15,000.00 toward the payment of his commission, $160,200.00 was properly paid to YVP, and the remaining $37,800.00 was willfully and without justification or excuse converted by Eames for his own purposes.

9. That in the course of other dealings with Design Builders, Inc., Eames, on behalf of YVP, came into possession of moneys paid in consideration of a grant by YVP of certain purchase option rights to Design Builders, Inc.

10. That Eames willfully and without justification or excuse converted a portion of such funds paid by Design Builders, Inc., for his own purposes, even though rightfully belonging to YVP.

11. During the months of August and September, 1986, Eames, on behalf of YVP, negotiated and ultimately executed an agreement for the sale of a residential lot owned by YVP described as Future Lot 9, Block 1, Hypark Subdivision, Second Filing,

before the final subdivision plat as to such land was approved.

12. That the purchaser of said lot paid Eames a total of $16,000.00 for the property, which amount was willfully and without justification or excuse converted by Eames for his own purposes.

13. That between July and November of 1985, Eames, on behalf of YVP negotiated and ultimately executed an agreement for the exchange and sale of a residential lot owned by YVP described as Future Lot 14, Block 1, Hypark Subdivision, Second Filing, before the final subdivision plat as to such land had been approved.

14. That the purchaser of said lot paid Eames a total of $27,000.00 for the property, which amount was willfully and without justification or excuse converted by Eames for his own purposes.

15. That during March of 1986, Eames, on behalf of YVP, negotiated and ultimately executed an agreement for the sale of a residential lot owned by YVP described as Future Lot 3, Block 2, Hypark Subdivision, Second Filing, before the Final subdivision plat as to such land had been approved.

16. That the purchaser of said lot paid Eames a total of $25,570.00 for the property, which amount was willfully and without justification or excuse converted by Eames for his own purposes.

17. That the aforementioned acts of conversion and fraud were perpetrated by Eames by depositing certain receipts properly belonging to YVP into a bank account unknown to YVP (such account being an account at First Citizens Bank, Billings, Montana, maintained by Eames in the name of "First Realty Co. Operating Account") and by failing to account to YVP for such receipts.

18. That in addition to the foregoing, Eames committed other acts of fraud, misrepresentation and conversion consisting of the conversion of other funds belonging to YVP for his personal use, the use of false pretenses to obtain funds from others for which YVP was ultimately responsible, misrepresentations to YVP to conceal his

fraud and conversion, and the conspiring with others in order to conceal his fraud.

19. That as a result of the aforedescribed acts of fraud, misrepresentation and conversion committed by Eames, YVP was damaged in a total amount which is not ascertainable with absolute certainty. However, to avoid costly and protracted litigation, YVP and Eames stipulated that the damages to YVP totalled $166,850.00.

20. YVP discovered the aforedescribed conversion some time in October, 1986, and on or about April 30, 1987, YVP brought suit against Eames in Yellowstone County Cause No. DV 87-728. By such suit, YVP sought in excess of $200,000.00 in damages plus punitive damages against Eames.

21. After discovery had been completed in Cause No. DV 87-728, Eames, and his then counsel of record, consented to entry of judgment in favor of YVP in the amount of $166,850.00, based on the aforementioned factual background.

22. On July 15, 1988, the State District Court entered its Findings of Fact, Conclusions of Law, and Order in Cause No. DV 87-728. Pursuant to the Conclusions of Law entered, it was determined by the State District Court that: Eames willfully and without justification or excuse converted funds rightfully belonging to YVP for his own purposes; that Eames committed fraud against YVP; and that as a result of Eames' intentional acts of conversion and/or fraud, YVP was damaged in the amount of $166,850.00.

23. On July 15, 1988, judgment was entered by the State District Court in favor of YVP and against Eames in the amount of $166,850.00, together with interest at the rate of 10% per annum from the date of the judgment until paid.

## DISCUSSION

Section 523(a)(4), provides that debts incurred by "fraud or defalcation while [the debtor was] acting in a fiduciary capacity, embezzlement or larceny" are non-dischargeable. The issue presented as to the case *sub judice* is whether the debtor, Eames, was "acting in a fiduciary capaci-

ty" when he committed the defalcation. *Rocky Martin General Agency v. Rustad,* 5 Mont.B.R. 44, 45 (Bankr.Mt.1987) adopted the holding of the decision of the Ninth Circuit Court of Appeals of *Ragsdale v. Haller,* 780 F.2d 794 (9th Cir.1986), which case is factually close to the present case. *Ragsdale* holds:

The meaning of "fiduciary" in § 523(a)(4) is an issue of federal law. See *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934); [*In re* ] *Pedrazzini,* 644 F.2d [756] at 758 [9 Cir.1981]. The broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context. See *Angelle v. Reed (In re Angelle),* 610 F.2d 1335, 1338–39 (5th Cir. 1980). The trust giving rise to the fiduciary relationship must be imposed prior to any wrongdoing; the Debtor must have been a "trustee" before the wrong and without reference to it. *Davis,* 293 U.S. at 333, 55 S.Ct. at 153–54; *Pedrazzini,* 644 F.2d at 758. These requirements eliminate constructive, resulting or implied trusts. *Pedrazzini,* 644 F.2d at 759.

Although the concept of fiduciary is to be narrowly defined as a matter of federal law, state law is to be consulted to determine when a trust in this strict sense exists. *Id.* at 758. Ragsdale asserts that all California partners are fiduciaries, pointing to Cal.Corp.Code § 15021 (West 1977) and to a string of court decisions. § 15021(1) provides:

Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

He claims that the words "hold as trustee" establish an express trust, that all partners are trustees for the rest of the partnership, and that a partner is therefore a fiduciary within the meaning of the act. However, under this statute, the trust arises only when the partner

derives profits without consent of the partnership; it is the sort of trust *ex maleficio* not included within the purview of § 523(a)(4). See *Davis*, 293 U.S. at 333, 55 S.Ct. at 153–54; *Teichman v. Teichman (In re Teichman)*, 774 F.2d 1395, 1399 (9th Cir.1985). But see *Holmes v. Kraus (In re Kraus)*, 37 B.R. 126, 130 (Bkcy E.D.Mich.1984) (holding that partners are fiduciaries for the purpose of § 523(a)(4) relying on Michigan statute with identical language).

Montana has an identical code section to Cal.Corp.Code § 15021(1). Section 35–10–405(1), M.C.A. states:

"Every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property."

By reason of the holding in *Ragsdale*, without more than the statutory constructive trust imposed on each partner to the partnership, the fiduciary element is not satisfied under federal law.

*Ragsdale*, however, found that California law raised the duties of partners beyond that required by the California Code, and adopted an express trust duty that—

"partners are trustees for each other, and in all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his co-partners, and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse pressure of any kind,"

citing *Leff v. Gunter*, 33 Cal.3d 508, 514, 658 P.2d 740, 744, 189 Cal.Rptr. 377, 381 (1983). *Id.* at 796. By reason of such case authority, *Ragsdale* held that "California partners are fiduciaries within the meaning of Section 523(a)(4) * * *." *Id.* 796–97. The only case authority in Montana regarding corresponding partner obligations is *Hansen v. Hansen*, 130 Mont. 175, 297 P.2d 879 (1956). A careful reading of the *Hansen* decision shows that Montana has,

like California, adopted a rule of express trust between partners. *Hansen* holds:

"The general rule is, where, as here, a partner assumes the responsibility of management and operation of a partnership business, and takes over the accounts, books and bank accounts thereof, he acts as a trustee for the partnership * * *."

*Hansen* cites with approval *Hatten v. Interocean Oil Co.*, 182 Okl. 465, 78 P.2d 392, 116 A.L.R. 727 (1938), which holds:

"It is generally held that it is the duty of a partner who manages, conducts or operates the partnership business to render accounts of his management of the business and, acting as a trustee for the firm, he must render full, exact and true account of all transactions to his partner or partners. Each partner should be charged with everything which he should justly pay or account for to the firm, and credited with everything which the firm, as a distinct entity, should pay or account for to him." 78 P.2d at 397.

It is clear the trustee obligation is thus independent of, and in addition to, the statutory duty. *Hansen*, 297 P.2d at 883, cited the predecessor to Section 35–10–405(1) in discussing the negligence of a managing partner in failing to keep accurate books. But the other trust duty imposed by common law doctrine was also adopted, and thus, like California as found in *Ragsdale*, supra, Montana partners are fiduciaries within the meaning of Section 523(a)(4).

In *Ragsdale*, as well as *Leff v. Gunter*, and *Hansen v. Hansen*, supra, partners were parties against partners, absent the separate legal entity of the partnership. Moreover, each case holds that the trust duty runs not to the partnership, for the Code covers that trust *ex maleficio*, but rather to each partner. In the present case, only the partnership, not the partners, are objecting to the discharge, and only the partnership, a distinct legal entity, has recovered the state court judgment. Under this posture of the case, Section 523(a)(4) offers no relief to the partnership, for the only trust imposed against a partner to partnership is a trust based on state

law which, as *Ragsdale* holds, imposes a trust *ex maleficio,* because the "trust arises only when the partner derives profits without consent of the partnership * * * ". *Ragsdale,* supra, at 796. Further, as to the surety, Safeco, it cannot assert any rights under Section 523(a)(4) for it is not a partner. There was no fiduciary duty of any kind between the Debtor Eames, and Safeco. By the reason of the foregoing analysis, the partnership's claim of non-dischargeability under Section 523(a)(4), and that of Safeco, fails. This holding is in accord with the rule that the concept of fiduciary under federal law is to be narrowly construed.

■ The other ground asserted for non-dischargeability by the partnership and Safeco is Section 523(a)(6), which provides that debts are non-dischargeable when incurred "for willful and malicious injury by the debtor to another". *In re Cecchini,* 772 F.2d 1493 (9th Cir.1985) governs the result. *Cecchini* holds, in discussing the split of authority as to the term "willful and malicious injury":

> "Plaintiff's construction of 'willful and malicious' accords with that of other circuits which have recently addressed the matter. See e.g., *In re Franklin,* 726 F.2d 606, 610 (10th Cir.1984) (' "willful and malicious" requires the intentional doing of an act which leads to injury'); *In re Held,* 734 F.2d 628, 629–30 (11th Cir.1984) (a finding of recklessness does not resolve the § 523(a)(6) inquiry); *Matter of Quezada* 718 F.2d 121, 123 (5th Cir.1983) (' "willful" means deliberate, a deliberate and intentional act which necessarily leads to injury'); *Seven Elves, Inc. v. Eskenazi,* 704 F.2d 241, 245 (5th Cir.1983) (without just cause or excuse).

This construction is also in accord with that set forth in the leading bankruptcy treatise:

> In order to fall within the exception of Section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excessive, even in the absence of personal hatred, spite, or ill-will. The word "willful" means "deliberate or intentional," a deliberate and intentional act which necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury.

3 Collier on Bankruptcy § 523.16 at 523–118 (15th ed. 1983). The 'reckless disregard' standard of *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1902) and its progeny has been explicitly overruled. See, id. at § 523.16(3) and 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6320–21." *Id.* at 1495.

Thus, the test is whether the debt was created by a willful and malicious act by the Debtor, done intentionally, and without just cause. Specific intent to injure is not an element.

■ In the present case, the facts establish by clear and convincing evidence that this Debtor converted property and funds to his own use, without any just cause, and to the damage of the partnership in the sum of $166,850.00. Of that sum, Safeco has paid $10,000.00 to the partnership, thus reducing its loss to $156,850.00. *Cecchini* involved a conversion of funds, as does the present case and holds:

> "With respect to the specific act of conversion, *Collier* states that 'the conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, is a willful and malicious injury within the meaning of the exception.' *3 Collier on Bankruptcy,* § 523.15[1] at 523–120 (citations omitted). This formulation accords with the Supreme Court's holding in *McIntyre v. Kavanaugh,* 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916), affirming a lower court's determination that debts from conversion are willful and malicious, and therefore, nondischargeable. In so holding, the Court rejected the requirement that malice toward the individual need be shown, emphasizing that it is the 'honest debtor, and not a malicious wrongdoer,

that [is] to be discharged.' Id. at 142, 37 S.Ct. at 40 (quoting *Tinker v. Colwell,* 193 U.S. 473, 488, 24 S.Ct. 505, 509, 48 L.Ed. 754 (1906)." *Id.* at 1496.

Based on the foregoing, I hold that the debt due the partnership in the sum of $156,850.00 is non-dischargeable under § 523(a)(6).

■ The sum paid by Safeco of $10,-000.00 is dischargeable since the actions of the debtor, albeit dishonest, were committed against the partnership, not Safeco. In other words, there was no intended wrongdoing against Safeco, who is a third party to the transaction only by reason of the surety bond in existence at the time of the defalcation. The act of defalcation is the very purpose for the bond, and Plaintiff has cited no authority by which Safeco can bootstrap the partnership's right of action under § 523(a)(6) against the Debtor. Indeed, the stipulated facts wholly fail to disclose any dishonest activities by the Debtor against Safeco. While the facts are only disclosed in the Creditors' brief, it is obvious the liability to Safeco arises from a breach of contract under the surety bond. As stated in *In re Akridge,* 71 B.R. 151, 154 (Bankr.S.D.Cal.1987):

> "Debts which are excepted from discharge under Section 523(a)(6) relate solely to tortious liabilities and not to debts stemming from breach of contract. (citing cases)"

Since objections to discharge are to be strictly construed in favor of the Debtor, *In re Boyer,* 62 B.R. 648 (Bankr.Mont. 1986), and against the Creditor, the Creditor, Safeco, has failed to sustain its burden of proof.

IT IS ORDERED the clerk shall enter judgment in favor of Yellowstone Valley Properties, a Montana general partnership, and against the Defendant, Kenneth L. Eames, in the sum of $156,850.00. It is further ordered said judgment is non-dischargeable under 11 U.S.C. Section 523(a)(6).

It is further ordered the Complaint of Plaintiff Safeco Insurance Company of America against defendant, Kenneth L. Eames, is dismissed.