**In re Dan G. MAILATH, Debtor.**

**Roger E. SUSI, Plaintiff,**

v.

**Dan G. MAILATH, Defendant.**

**Bankruptcy No. 86–01281–C.
Adv. No. 86–0402–C.**

United States Bankruptcy Court,
N.D. Oklahoma.

Dec. 13, 1989.

Terry M. Thomas, Tulsa, Okl., for plaintiff.

Christopher J. Bernard, Tulsa, Okl., for defendant.

## SECOND AMENDED MEMORANDUM OPINION, ORDER, FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEPHEN J. COVEY, Bankruptcy Judge.

On November 28, 1989, the Court heard Defendant's Motion for Rehearing to reconsider its Amended Memorandum Opinion, Order, Finding of Facts and Conclusions of Law dated September 14, 1988, and granted such motion for the reasons stated on the record. After considering the arguments and examining the authorities of counsel, the Court amends it previous order, as follows:

### FINDINGS OF FACT

1. On May 13, 1982, Dan G. Mailath, along with Ken B. Adams and Clyde J. Dunavent, Jr., entered into a partnership agreement for the purpose of constructing condominium homes on Grand Lake in Delaware County, Oklahoma. At this time, the partnership borrowed $230,000.00 from the First National Bank and Trust Company of Vinita, Oklahoma to purchase land for the development. The partnership also obtained from said Bank a line of credit in the amount of $350,000.00 for the purpose of constructing the first two homes in the development.

2. Prior to November 23, 1983, the Chairman of the Board of Directors of the Bank informed Mailath that the loans would not be renewed unless certain conditions were met, including the addition of new partners. At this time, two homes had been constructed but neither had been sold.

3. On November 23, 1983, the partnership owed the following monies to the Bank:

$230,000.00  original land purchase
300,000.00  advances made under line of credit
——————
$530,000.00

The following events occurred on this date:

a. The above debt was restructured and the Bank took two notes secured by mortgages on the houses in the amounts of $133,200.00 and $111,600.00. These notes totaled $244,800.00 and were deducted from the amount due on the line of credit. This left a balance due on the line of credit of $55,000.00.

b. Susi and Luis V. Gorospe joined the partnership and signed the two notes mentioned above in the total amount of $244,800.00.

c. The five members of the partnership each contributed $5,000.00 for a total of $25,000.00 which amount was applied on the remaining balance of $55,000.00 due under the line of credit. This left a balance due of $30,000.00.

d. After this restructuring and new advances, the debt of the partnership was as follows:

$230,000.00  original land purchase
133,200.00  mortgage on first house
111,600.00  mortgage on second house
30,000.00  amount due on line of credit
——————
$504,800.00

e. Before executing the notes and mortgages on the two houses, both Susi and Gorospe were told by Mailath that the total indebtedness of the partnership was only the amount due on the two houses, or $244,800.00.

5. Early in 1984, Susi noted a third house being constructed. Mailath told him that they had a buyer for this house and

they were going to borrow an extra $135,000.00 from the Bank for construction of the third house.

6. Thereafter, on April 10, 1984, Mailath brought Susi a note for $380,000.00 which Susi signed. Mailath represented this note to be a combination of the amounts due on the two house mortgages plus $135,000.00 to build the third house. [$244,800.00 + $135,000.00 = $379,800.00 (approximately $380,000.00)]. In fact, this new $380,000.00 note was for a new construction line of credit of $350,000.00 plus the amount of $30,000.00 remaining on the original line of credit.

7. On June 15, 1984, Mailath obtained Susi's signature on another note in the amount of $230,000.00. Mailath informed Susi that the third house had now been sold for $150,000.00 which amount had been applied against the $380,000.00 line of credit, leaving a balance due of $230,000.00. In fact, this $230,000.00 note was a renewal of the original land purchase note and had nothing to do with the sale of the third house.

8. When Susi signed the final note, he was informed that this represented the total indebtedness of the partnership. In fact, at this time, the total indebtedness of the partnership was as follows:

| | |
|---|---|
| $230,000.00 | original land purchase |
| 133,200.00 | mortgage on first house |
| 111,600.00 | mortgage on second house |
| 279,000.00 | amount due on new line of credit |
| $753,800.00 | |

9. On June 2, 1986, Mailath filed for relief under chapter 7 of the Bankruptcy Code.

10. The Bank foreclosed upon its mortgage and sold the property, leaving a deficiency of $925,000.00. Thereafter, the Bank sought a deficiency judgment against Susi and in March, 1987 obtained such deficiency judgment against him for approximately $1,000,00.00, inclusive of attorneys' fees and costs. On May 26, 1987, Susi filed for relief under chapter 7 of the United States Bankruptcy Code. His trustee later abandoned all interest in the claim against Mailath. On May 13, 1988, the United States Bankruptcy Court for the Northern District of Oklahoma entered its order converting Susi's bankruptcy case to a case under chapter 11. The Court confirmed Susi's Third Amended Plan of Reorganization on April 28, 1989.

## CONCLUSIONS OF LAW

11. On August 25, 1986, Susi filed a complaint to determine the dischargeability of his debt against Mailath under § 523 of the Bankruptcy Code. Mailath filed a general denial thereof. The complaint is drawn in general terms and it is difficult for this court to determine the exact basis of the objections. However, the court did enter a pretrial order submitted by the parties and the basic issues therein were whether the debt of Mailath to Susi is excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A) and (B) and 523(a)(4) which are as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

\* \* \* \* \* \*

(4) [constituting] fraud or defalcation while acting in a fiduciary capacity....

12. The Court first holds that there is a debt from Mailath to Susi in an amount yet to be determined based upon Mailath's mis-

representations to Susi in obtaining Susi's signature on the various notes.

■ 13. The Court holds that Mailath's debt to Susi's cannot be excepted from discharge under § 523(a)(2)(A) or (B). In this case, the false representations made were oral and were made in regard to Mailath's financial condition or the financial condition of an insider, the partnership. False representations about your own financial condition or that of a insider must be in writing to form the basis of a nondischargeable debt under § 523(a)(2).

■ 14. However, the Court holds that the debt of Mailath to Susi is excepted from discharge under § 523(a)(4) because such debt is for fraud while acting in a fiduciary capacity.

15. An express or technical trust, arising by agreement or by state law prior to the commission of any wrongful act, must exist between the parties to create the requisite fiduciary capacity under § 523(a)(4). *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Romero*, 535 F.2d 618 (10th Cir.1976); *In re Black*, 787 F.2d 503 (10th Cir.1986). While federal law defines "fiduciary capacity", state law may impose a trust relationship sufficient to constitute "fiduciary capacity" for the purposes of § 523(a)(4). *Romero* at 621; *Black* at 506. This Court has previously held that the elements of such a trust are the intent to create a trust, a clearly defined trust res, and specific trust duties. *In re Stefanoff*, 97 B.R. 607, 609 (Bankr.N.D.Okl.1989).

16. Oklahoma common law clearly evinces an intent that general partners act as trustee for one another and this relationship is imposed from the inception of the partnership and not from any act of wrongdoing.[1] Ironically, the strongest statement of Oklahoma law on this issue is found in *Application of Mailath*, 752 P.2d 803, 809–810 (Okl.1988), wherein the Oklahoma Supreme Court upheld the Oklahoma Board of Bar Examiners' rejection of Mailath's application for admission to the bar. The Court there expressly stated that Mailath, in his capacity as partner, was a "trustee ... held to something stricter than the morals of the market place." *Mailath*, at 810, quoting *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928). See also *Oklahoma Company v. O'Neil*, 440 P.2d 978, 984 (Okl.1968); *Knapp v. First Nat. Bank & Trust Co. of Oklahoma City*, 154 F.2d 395, 398 (10th Cir.1946); *Hatten v. Interocean Oil Co.*, 182 Okl. 465, 78 P.2d 392, 397 (1938); *Thomas v. Mathis*, 181 Okl. 1, 72 P.2d 484, 486 (1937).

17. In addition to evincing the requisite intent to create a trust relationship between general partners, Oklahoma common law, as set forth in the cases cited above, creates a trust res consisting of the assets of the partnership and also imposes various trust duties, such as the duty of utmost good faith and the duty of a managing partner to render full, exact, and true accounts of all transactions to his partner or partners.

18. In *Tindale v. Blatnik*, 101 B.R. 718, 721, the Bankruptcy Court for the Eastern District of Oklahoma has concluded that Oklahoma common law creates the requisite trust relationship between general partners under § 523(a)(4). Furthermore, the Ninth Circuit Court of Appeals, construing similar common law in California and Washington, has determined that such laws create the requisite trust relationship between general partners or joint venturers under § 523(a)(4). See *Ragsdale v. Haller*, 780 F.2d 794, 796–797 (9th Cir. 1986); *Lewis v. Short*, 818 F.2d 693, 695 (9th Cir.1987). The Court agrees with the reasoning of these cases and holds that Mailath was acting in a fiduciary capacity

---

1. Oklahoma statutory law governing general partners does not create the requisite trust relationship. Title 54 O.S. § 221 requires that every partner hold "as trustee" for the partnership "any profits derived by him without the consent of the other partners ..." This statutory trust arises only when the partner derives profits without the consent of the other partners and not prior to the commission of any wrongful act and therefore does not create the requisite trust relationship under 11 U.S.C. § 523(a)(4). See *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986).

with respect to Susi in regard to partnership matters.

19. Finally, the evidence clearly and convincingly indicates that Mailath induced Susi to enter into the debt by fraud. Fraud within the meaning of § 523(a)(4) consists of positive, intentional misrepresentation or falsehood. *In re Katzen*, 47 B.R. 738, 742 (Bankr.D.Mass.1985). By intentionally misrepresenting the true nature of the notes and the partnership's financial status, Mailath perpetrated a fraud on Susi and breached his fiduciary duty. The Court finds that Susi would not have entered into the debt were it not for the fraudulent representations of Mailath.

20. Accordingly, the debt of Susi was incurred as a result of Mailath's fraud while acting in a fiduciary capacity and such debt is excepted from discharge under § 523(a)(4).

21. The Court reserves for a later hearing the determination on the amount of Susi's claim against Mailath arising out of these transactions. Notice is hereby given that this Court will conduct a hearing at 10:30 a.m. on the 19th day of December, 1989, to determine that issue.