In re Edgar Andrew SEAY, Debtor.

Ray E. HOLADAY, Plaintiff–Appellant,

v.

Edgar Andrew SEAY, also known as E.A. Seay, also known as Andy Seay, Defendant–Appellee.

BAP No. WO–97–042.
Bankruptcy No. 96–13854.
Adversary No. 96–1265.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Dec. 16, 1997.

Steven L. Tolson, Oklahoma City, OK, for Plaintiff–Appellant.

W. Rogers Abbott II of Rogers Abbott & Associates, Oklahoma City, OK, for Defendant–Appellee.

Before PUSATERI, BOULDEN and ROBINSON, Bankruptcy Judges.

## OPINION

BOULDEN, Bankruptcy Judge.

Ray E. Holaday (Holaday) seeks reversal of two bankruptcy court orders that resulted in the discharge of a debt owed to him by Edgar Andrew Seay (Debtor), the Chapter 7 Debtor. The orders appealed from are an Order Denying Plaintiff's Motion for Summary Judgment and Granting Defendant's Motion for Summary Judgment (Summary Judgment Order) on Holaday's 11 U.S.C. § 523(a)(4) [1] claim for relief, and a Judgment, Findings of Fact, Conclusions of Law and Decision on Trial of Adversary Proceeding (Judgment) denying Holaday's remaining claims for relief under § 727(a)(2)(A) and § 727(a)(4)(A). We are asked not only to reverse the Summary Judgment Order and Judgment, but to enter judgment denying the Debtor's discharge. For the reasons set forth below, we AFFIRM.

---

**1.** Future references are to Title 11 of the United States Code unless otherwise noted.

## I. BACKGROUND

The Debtor and his wife Pamela Seay (Pamela Seay) are both accountants. Together they owned APK Enterprises, Inc. (APK), a tax and bookkeeping service that also did business as Edmond Marble Company. In 1987, the Debtor, APK and Holaday, entered into an oral agreement to combine the resources of Roman Marble Company, which had been owned exclusively by Holaday, and Edmond Marble Company to form a new entity known as Edmond Marble Company (Edmond Marble). The nature of Edmond Marble as a legal entity came to be disputed.

Edmond Marble was sold in 1991, except for its date-of-sale accounts receivable. The Debtor and Holaday split the $120,000 proceeds from the sale of Edmond Marble equally, and the Debtor agreed to liquidate and distribute the date-of-sale accounts receivable. As the Debtor collected the accounts receivable, he deposited them into the checking account maintained by Edmond Marble, but eventually transferred the funds into personal accounts owned jointly by himself and Pamela Seay. The Debtor failed to pay Holaday his share of the liquidated accounts receivable.

Holaday sued the Debtor in Oklahoma state court to recover his share of the accounts receivable, and for an accounting and dissolution of Edmond Marble. Oklahoma civil procedure requires that an action asserting both legal and equitable claims for relief be resolved in a two-part proceeding. After a four-day bench trial on the equitable claims, the state court entered a Journal Entry of Judgment on September 1, 1995, in favor of Holaday and against the Debtor and APK, jointly and severally. The state court determined that Edmond Marble had been operated in the form of a joint venture, that the joint venture terminated when its assets were sold, and that the Debtor was obligated by written instrument to collect the date-of-sale accounts receivable and remit Holaday's share to him.

Holaday next applied to the state court for proceedings in aid of execution to collect on the Journal Entry of Judgment. The state court issued an order dated September 27, 1995 (Injunction) enjoining the Debtor and APK from transferring or disposing of their property until further order of the court. The Injunction was merely a post-judgment order to determine from what property the Journal Entry of Judgment could be collected and did not impose a trust on any specific funds. Upon the Debtor's motion, the Injunction was dissolved on October 24, 1995, on the ground that the Journal Entry of Judgment upon which it was based was interlocutory.

On October 13 and 16, 1995, during the period when the Injunction was still *extant*, four personal joint accounts of the Debtor and Pamela Seay were closed. Pamela Seay withdrew approximately $17,000 from two of the joint accounts and established accounts in her name only. On October 16, 1995, Pamela Seay also liquidated a $20,000 certificate of deposit (CD) held in joint tenancy. Holaday asserted that funds from the date-of-sale accounts receivable to which he was entitled were used to purchase the CD, but the Debtor disputed Holaday's entitlement to the funds. The CD had been pledged as collateral for a loan from Liberty Bank to APK and could not be cashed without repaying the loan balance. Pamela Seay used $14,000 of the proceeds of the CD to pay off APK's line of credit with Liberty Bank, and the remaining $6,000 was transferred by her into her newly opened personal checking account. The Debtor, as president of APK, prepared a $14,000 promissory note dated October 13, 1995, in favor of Pamela Seay secured by personal property of APK. The October 13, 1995, promissory note was designed to substitute Pamela Seay in place of Liberty Bank as the secured creditor on the $14,000 obligation.

On February 26, 1996, three months prior to the petition date, the state court conducted the second part of the litigation regarding Holaday's legal claims for fraud, deceit, and breach of fiduciary duty. During the jury trial, the Debtor admitted that after the date of the sale of Edmond Marble, he kept the date-of-sale accounts receivable in accounts held jointly with Pamela Seay in order to earn interest on the money. The Debtor also testified that any accounts receivable owed to

Holaday were still in a checking account held jointly with Pamela Seay. The jury instruction regarding breach of fiduciary duty required that the jury find the Debtor committed some act in bad faith or failed to deal fairly with Holaday in order to find in Holaday's favor. The state court jury returned a verdict against the Debtor on Holaday's claims for fraud, deceit, and breach of fiduciary duty. On April 24, 1996, the state court entered judgment against the Debtor on Holaday's claim for compensatory damages (State Court Judgment). The State Court Judgment incorporated the Journal Entry of Judgment dated September 1, 1995.

The Debtor filed a petition for relief under Chapter 7 of the United States Bankruptcy Code on May 22, 1996. Question 11 of the Debtor's statement of affairs listed personal bank accounts held jointly with Pamela Seay containing $38,158.60 that were closed within one year of the petition date. The Debtor's schedules listed cash assets of $11.00.

Holaday filed this complaint seeking to except the State Court Judgment of approximately $95,600 from discharge under § 523(a)(4),[2] or in the alternative, seeking a denial of the Debtor's discharge under § 727(a)(2)(A) and § 727(a)(4)(A).[3] Cross motions for summary judgment were filed on Holaday's § 523(a)(4) claim for relief. The Summary Judgment Order granted the Debtor's motion for summary judgment dismissing the § 523(a)(4) action upon a finding that no fiduciary relationship existed between the parties.

The bankruptcy court conducted a trial of the § 727(a)(2)(A) and § 727(a)(4)(A) claims for relief, and entered Judgment in favor of the Debtor. Addressing the § 727(a)(2)(A)

action, the bankruptcy court found that the testimony was not altogether clear whether the Debtor and Pamela Seay discussed transferring money from the joint accounts to Pamela Seay's personal account, and that there was insufficient evidence to prove the intent required under that section. The Judgment indicated that the evidence, including all logical inferences to be derived therefrom, did not establish that it was more likely than not that the Debtor took or permitted the funds to be transferred with the intent to hinder, delay, or defraud Holaday.

In denying Holaday's claim for relief under § 727(a)(4)(A), the bankruptcy court found that Holaday's evidence, including all logical inferences derived therefrom, failed to establish that the Debtor knowingly and fraudulently made a false oath when he listed cash assets of only $11.00 in his bankruptcy schedules. The bankruptcy court ruled that any claimed discrepancies in the Debtor's petition and schedules, even if false, were not sufficiently material or significant to result in a denial of discharge.

Holaday complains that, upon the evidence presented, the bankruptcy court could not have found a lack of intent on the Debtor's part, even in consideration of the conflicting evidence. Holaday maintains that the bankruptcy court knew of the Debtor's untruthfulness and liability for damages suffered by Holaday for the Debtor's acts of fraud, deceit, and breach of fiduciary duty, yet this had no effect on the bankruptcy court's ruling. Holaday isolates four excerpts of testimony that he identifies as proof that the Debtor lied, argues that the lies were compelling badges of fraud and that such proof requires us to reverse the bankruptcy court's judgment as clearly erroneous.

**2.** Section 523(a)(4) provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny

. . . .

**3.** Section 727(a)(2)(A) and Section 727(a)(4)(A) provide:

(a) The court shall grant the debtor a discharge, unless—

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition;

. . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account . . . .

## II. DISCUSSION

This court, with the consent of the parties, has jurisdiction to hear appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit. 28 U.S.C. § 158(a)(1), (b)(1) and (c)(1). The parties have consented to this court's jurisdiction because neither party has opted to have the appeal heard by the United States District Court for the Western District of Oklahoma. *Id.* at § 158(c); 10th Cir. BAP L.R. 8001–1(a) and (e).

■ "[A] decision is ordinarily considered final and appealable ... only if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, ——, 116 S.Ct. 1712, 1718, 135 L.Ed.2d 1 (1996) (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). The bankruptcy court's Summary Judgment Order on the § 523(a)(4) claim for relief, combined with the Judgment from the trial of Holaday's § 727(a)(2)(A) and § 727(a)(4)(A) claims for relief, disposed of the entire complaint and are appealable for purposes of 28 U.S.C. § 158(a)(1). *See generally Aviles v. Lutz,* 887 F.2d 1046, 1047 n. 1 (10th Cir.1989) (trial court must dispose of entire complaint for final appealable judgment).

### A. *Dischargeability of a Debt Pursuant to § 523(a)(4).*

#### 1. Standard of Review.

Holaday's appeal of the Summary Judgment Order on the § 523(a)(4) claim arises from opposing motions for summary judgment. Holaday does not assert the bankruptcy court erred in its determination that no disputed issue of material fact existed. Instead, Holaday asserts he was entitled to summary judgment as a matter of law because Oklahoma common law holds that joint venturers owe a fiduciary duty to one another, and since the Debtor violated that duty, the State Court Judgment is nondischargeable under § 523(a)(4).

■ The United States Court of Appeals for the Tenth Circuit has ruled that whether the trial court correctly applied the substantive law in ruling on a motion for summary judgment is reviewed *de novo* .

We review the grant or denial of summary judgment *de novo,* applying the same legal standard used by the [trial] court pursuant to Fed.R.Civ.P. 56(c).... If there is no genuine issue of material fact in dispute, then we next determine if the substantive law was correctly applied by the [trial] court.

*Wolf v. Prudential Ins. Co. of America,* 50 F.3d 793, 796 (10th Cir.1995).

"[B]ecause summary judgment may only be granted where there is no genuine issue of material fact, any purported 'factual findings' of the bankruptcy court cannot be 'factual findings' as to disputed issues of fact, but rather are conclusions as a matter of law that no genuine issue of material fact exists; such conclusions of law are, of course, subject to plenary review.... [A]ny application of the 'clearly erroneous' standard is, in itself, clearly erroneous." *Rosen v. Bezner,* 996 F.2d 1527, 1530 n. 2 (3d Cir.1993). The determination of the existence of a fiduciary duty is a legal conclusion, rather than a factual finding, and reviewed on a *de novo* basis. *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir.1996) (rule of professional conduct was simply a disclosure rule and insufficient to place attorney in position of a trustee with client).

#### 2. A General Fiduciary Duty of Confidence, Trust, Loyalty, and Good Faith is Insufficient to Establish a Fiduciary Relationship for Purposes of § 523(a)(4).

■ In order for the debt represented by the State Court Judgment to be excepted from discharge under § 523(a)(4), Holaday must have proved that: (1) a fiduciary relationship existed between the Debtor and Holaday, and (2) fraud or defalcation was committed by the Debtor in the course of that fiduciary relationship. *Fowler Bros.,* 91 F.3d at 1371. Holaday had the burden of proof to establish these elements by a preponderance of the evidence. *Nelson v. Tsamasfyros (In re Tsamasfyros),* 940 F.2d 605, 607 (10th Cir.1991); *Medved v. Novak (In re Novak),* 97 B.R. 47, 58 (Bankr.D.Kan.1987). "[E]x-

ceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor." *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir.1997).

In *Fowler Bros.*, the Tenth Circuit construed the phrase "fiduciary capacity" as that term should be used for purposes of § 523(a)(4). Interpreting the phrase narrowly, the court stated, in relevant part, that:

> The existence of a fiduciary relationship under § 523(a)(4) is determined under federal law. However, state law is relevant to this inquiry. Under this circuit's federal bankruptcy case law, to find that a fiduciary relationship existed under § 523(a)(4), the court must find that the money or property on which the debt at issue was based was entrusted to the debtor. Thus, an express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4). Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability. Further, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy.

91 F.3d at 1371–1372 (citations and internal quotation marks omitted); *see Joseph v.*

*Stone (In re Stone)*, 91 B.R. 589, 593 (D.Utah 1988) (fiduciary relationship does not encompass ordinary commercial relationships such as principal/agent or creditor/debtor). Fiduciary capacity, as defined by federal law for purposes of § 523(a)(4), applies only to technical trusts, and not those that the law implies at contract. *Fowler Bros.*, 91 F.3d at 1377; *Allen v. Romero (In re Romero)*, 535 F.2d 618, 621 (10th Cir.1976) (statute imposed fiduciary duty under § 17(a)(4) of the Bankruptcy Act, the predecessor to § 523(a)(4), on contractor who had been advanced money to pay subcontractors pursuant to construction contract).

In this case, there is no express written agreement that establishes a fiduciary relationship. Neither can Holaday point to a fiduciary relationship arising from an Oklahoma statute because the Oklahoma version of the Uniform Partnership Act (UPA) does not impose a trust relationship on joint venturers sufficient to satisfy § 523(a)(4).[4] Under these circumstances, Holaday turns to Oklahoma common law for creation of a fiduciary relationship between members of a joint venture.[5]

Lower court opinions in the Tenth Circuit issued prior to *Fowler Bros.* were divided on the issue of whether the partners in a common law partnership or joint venture were fiduciaries as required by § 523(a)(4).[6] In

**4.** Courts of the Tenth Circuit have uniformly held that the UPA does not create the kind of fiduciary relationship required by § 523(a)(4). *Novak*, 97 B.R. at 59 (UPA only creates a trust after the partners derive profits without the consent of the partnership, and the trust created is therefore that sort of trust *ex maleficio* which is not included within the purview of § 523(a)(4)); *Beebe v. Schwenn (In re Schwenn)*, 126 B.R. 351 (D.Colo. 1991) (UPA does not create fiduciary relationship); *Susi v. Mailath (In re Mailath)*, 108 B.R. 290 (Bankr.N.D.Okla.1989) (Oklahoma statutory law governing general partners does not create the requisite trust relationship); *In re Weiner*, 95 B.R. 204 (Bankr.D.Kan.1989) (UPA does not create fiduciary relationship); *see also Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986).

**5.** *See In re Mailath*, 752 P.2d 803, 809–10 (Okla. 1988) (partner was a trustee "held to something stricter than the morals of the market place"); *Oklahoma Co. v. O'Neil*, 440 P.2d 978, 984 (Okla. 1968) (citing cases) (partner or joint adventurer occupies fiduciary position with respect to other

members and owes higher and greater duty to them than he owes to one with whom he deals at arm's length); *Clark v. Addison*, 311 P.2d 256 (Okla.1957) (the same general rules apply to both joint adventures and partnerships in dissolution and accounting between the parties).

**6.** *Compare Cundy v. Woods (In re Woods)*, 175 B.R. 78, 83–84 (Bankr.D.Colo.1994) (joint venturers were fiduciaries under Colorado law); *Beebe v. Schwenn (In re Schwenn)*, 126 B.R. 351, 353 (D.Colo.1991) (Colorado common law imposes a technical trust on partners thereby meeting the requirements of § 523(a)(4)); *Susi v. Mailath (In re Mailath)*, 108 B.R. 290, 293 (Bankr.N.D.Okla.1989) (Oklahoma common law requiring utmost good faith and duty to render full, exact, and true accounting imposes technical trust relationship sufficient for § 523(a)(4) as well as creating a trust *res* consisting of the assets of the partnership); *Tindale v. Blatnik (In re Tindale)*, 101 B.R. 718, 721 (Bankr.E.D.Okla. 1989) (Oklahoma common law imposing upon partners an obligation of utmost good faith and

the Summary Judgment Order, the bankruptcy court based its ruling against Holaday on the holding in *Tway v. Tway (In re Tway)*, 161 B.R. 274 (Bankr.W.D.Okla.1993), a case decided prior to *Fowler Bros.*, but consistent with the later Tenth Circuit ruling. The holding in *Tway* is at odds not only with the Colorado courts' holdings in *Beebe v. Schwenn (In re Schwenn)*, 126 B.R. 351 (D.Colo.1991) and *Cundy v. Woods (In re Woods)*, 175 B.R. 78, 83–84 (Bankr.D.Colo. 1994), but also with the Oklahoma bankruptcy courts in *Susi v. Mailath (In re Mailath)*, 108 B.R. 290, 293 (Bankr.N.D.Okla.1989), and *Tindale v. Blatnik (In re Blatnik)*, 101 B.R. 718, 721 (Bankr.E.D.Okla.1989). In both *Mailath* and *Blatnik*, the bankruptcy courts found that an Oklahoma common law duty of utmost good faith between partners creates a fiduciary relationship between partners or joint venturers sufficient for § 523(a)(4). Although there may have been inconsistent treatment of partners and joint venturers in Oklahoma cases under § 523(a)(4) prior to the ruling in *Fowler Bros.*, the ruling in *Tway* is consistent with *Fowler Bros.*, which is the most recent and controlling Tenth Circuit decision regarding the sufficiency of a trust relationship for purposes of § 523(a)(4). The Tenth Circuit stated "[n]either a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability." *Fowler Bros.*, 91 F.3d at 1372 (citations omitted).[7]

Even though the Oklahoma state courts may approve of a general policy that creates a fiduciary duty between joint venturers, this policy is not sufficient to fulfill the Tenth Circuit's requirements of a common law trust for purposes of § 523(a)(4). Accordingly, Holaday has not met his burden of showing the existence of a fiduciary relationship required under § 523(a)(4). Because this element has not been proven, this court need not address whether fraud or defalcation was committed.

### 3. Holaday did not Establish the Existence of a Trust *Res.*

▪ In addition to failing to prove the existence of an express or technical trust, Holaday failed to establish the existence of a trust *res*. Under Tenth Circuit bankruptcy case law, to find that a fiduciary relationship exists under § 523(a)(4), the Debtor must have been entrusted with money or property on which the debt at issue was based. *Fowler Bros.*, 91 F.3d at 1371; *Romero*, 535 F.2d at 621. An identifiable trust *res* must be established in order for an express trust to be created for purposes of § 523(a)(4).

Even if an Oklahoma common law trust existed at some point in the relationship between Holaday and the Debtor, according to the state court Journal Entry of Judgment, the relationship terminated when the business venture was sold to a third party. The state court found that the Debtor's obligation to collect date-of-sale accounts receivable was created by a "written agreement of sale." The sale agreement also effectively ended the joint venture and created the Debtor's obligation to collect and disburse Holaday's share of the date-of-sale accounts receivable to him. The subsequent jury trial on Holaday's claim for fraud, deceit, and breach of

---

integrity with respect to partnership affairs imposed fiduciary duty under § 523(a)(4)); *with Stone*, 91 B.R. at 593–94 (partner's general fiduciary duty is not sufficient to create an express or technical trust required under § 523(a)(4)); *Kayes v. Klippel (In re Klippel)*, 183 B.R. 252, 260 (Bankr.D.Kan.1995) (the fiduciary duty of a partner generally will not support exception from discharge under § 523(a)(4)); *Tway v. Tway (In re Tway)*, 161 B.R. 274, 280–81 (Bankr. W.D.Okla.1993) (fiduciary relationship under § 523(a)(4) must arise from express trust or technical trust imposed by statute that establishes a trust relationship prior to any wrongdoing by the debtor-fiduciary).

7. The Tenth Circuit relied upon the ruling in *Evans v. Pollard (In re Evans)*, 161 B.R. 474 (9th Cir. BAP 1993), as instructive authority. In *Evans*, a case dealing with whether a real estate broker qualified as a fiduciary under either California statutes and administrative regulations or case law, the Ninth Circuit Bankruptcy Appellate Panel decided that, while there was no question that the relationship between the parties fell within the broad general definition of a fiduciary relationship and the broker had the same obligation of undivided service and loyalty that a trust imposes on a trustee, a failure to fulfill a general fiduciary obligation in the absence of an identifiable trust *res* did not qualify as a trust relationship for purposes of § 523(a)(4).

fiduciary duties resulted in a money judgment for compensatory damages, not turnover of an existing trust *res*, even though the Debtor testified he still held the collected accounts receivable in his joint accounts.[8]

■ The $95,600 debt was based on the State Court Judgment that determined that the business relationship ended upon sale to a third party. Holaday does not sustain or support an argument (a) why the Debtor should be held to a fiduciary standard past the termination date of the joint venture, or (b) why an obligation to collect funds, created by written instrument, after the joint venture ended is sufficient to create an express trust *res* for purposes of dischargeability under § 523(a)(4).[9] Neither did Holaday sustain or support an argument that the Injunction imposed a trust on the date-of-sale accounts receivable rather than merely creating a general duty not to dispose of assets of both the Debtor and APK. Upon *de novo* review, we find no error in the bankruptcy court's interpretation of controlling law or its application of the uncontested facts to § 523(a)(4).

## B. *Denial of Discharge Pursuant to § 727.*

### 1. Standard of Review.

■ A bankruptcy court's findings concerning intent are factual and subject to review under a clearly erroneous standard. *Sinclair Oil Corp. v. Jones (In re Jones)*, 31 F.3d 659, 662 (8th Cir.1994) (bankruptcy court's findings concerning intent in § 523(a)(2)(B) claim is factual finding subject to clearly erroneous rule); *Graven v. Fink (In re Graven)*, 936 F.2d 378, 382 (8th Cir. 1991) (a finding of fraud under the bankruptcy code is a factual matter); *Tastee Donuts, Inc. v. Bruno*, 169 B.R. 588, 591 (E.D.La. 1994) (§ 727(a)(2)(A) intent to defraud finding subject to clearly erroneous standard); *see* Fed. R. Bankr.P. 8013. "Whether a debtor transferred his property with intent to defraud creditors is a finding of fact." *Baker v. Mereshian (In re Mereshian)*, 200 B.R. 342, 345 (9th Cir. BAP 1996) (bankruptcy court's findings of fact are reviewed under the clearly erroneous standard, and its conclusions of law are subject to *de novo* review). Review under the clearly erroneous standard is significantly deferential, requiring a " 'definite and firm conviction that a mistake has been committed.' " *Gillman v. Scientific Research Prods. Inc. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 555 (10th Cir. 1995) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

### 2. The Bankruptcy Court's Finding Pursuant to § 727(a)(2)(A) that the Debtor did not Transfer his Property on October 13 and 16, 1995, with Intent to Defraud Holaday was not Clearly Erroneous.

■ To obtain a denial of discharge under § 727(a)(2)(A), Holaday must prove four

---

8. In the absence of a written contract, the best that can be said is that by the jury instruction relating to breach of fiduciary duty, the state court may have intended to impose a resulting trust on the funds the Debtor collected from the liquidation of accounts receivable. A resulting trust does not give rise to the kind of fiduciary duty contemplated by § 523(a)(4). *See, e.g., Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934); *In re Marchiando*, 13 F.3d 1111, 1115 (7th Cir.1994) (constructive or resulting trust not sufficient to create fiduciary relationship under § 523(a)(4)); *Teichman v. Teichman (In re Teichman)*, 774 F.2d 1395, 1399–1400 (9th Cir.1985); *Barclays Am. / Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 878–79 (8th Cir.1985); *Berres v. Bruning (In re Bruning)*, 143 B.R. 253, 254 (D.Colo.1992); *Van De Water v. Van De Water (In re Van De Water)*, 180 B.R. 283, 289 (Bankr. D.N.M.1995).

9. Holaday urges us to apply *LSP Investment Partnership v. Bennett (In re Bennett)*, 989 F.2d 779 (5th Cir.1993). In *Bennett*, the Fifth Circuit held that, although Texas courts have not extended the partnership relationship generally to encompass the type of fiduciary duty envisioned by § 523(a)(4), an exception exists for the managing partner of a partnership, who owes to his co-partners, "one of the highest fiduciary duties recognized by law ." *Id.*, 989 F.2d at 783 (citations and internal quotation marks omitted). The Fifth Circuit recognized a split on this issue among the courts addressing whether a partner generally owes the type of fiduciary duty contemplated by § 523(a)(4). The Tenth Circuit's decision in *Fowler Bros.*, 91 F.3d at 1367, was rendered after *Bennett* and the Tenth Circuit declined to adopt the broader reading of § 524(a)(4) announced in *Bennett*. Holaday does not discuss the impact of *Fowler Bros.* on his argument urging us to adopt the ruling in *Bennett*.

elements by a preponderance of the evidence: 1) that a transfer of property occurred; 2) that the debtor owned the property transferred; 3) that the transfer occurred within one year of filing the petition; and 4) that the debtor had, at the time of the transfer, the intent to defraud a creditor. There is no dispute that funds in the joint accounts were transferred on October 13 and 16, 1995, within one year of the petition date. Thus, the first and third elements of the test under § 727(a)(2)(A) were satisfied. Regarding the second element, the bankruptcy court did not specifically address the issue of whether the Debtor owned the property transferred. The evidence presented at trial on this point was conflicting. However, the bankruptcy court's ruling that the fourth element did not exist avoided any need to resolve the question of the ownership of the property. We would need to address this matter further only if we were to reverse that ruling. We will now examine the ruling on the fourth element.

■ Holaday urges this court to reverse the bankruptcy court's factual finding on the fourth element that the Debtor lacked the intent to hinder, delay, or defraud creditors. If, in fact, it was the Debtor's property that was transferred or allowed to be transferred, Holaday asserts that the Debtor's intent to defraud is proven by four instances of contradictory evidence. Because of these four contradictions, Holaday asserts that it was impossible for the bankruptcy court not to conclude from the evidence that the Debtor

acted in concert with Pamela Seay to transfer funds in the joint accounts solely into Pamela Seay's name with the intent to defraud creditors. The bankruptcy court weighed the testimony produced by Holaday, the Debtor, and Pamela Seay and, based on the demeanor of the witnesses, reached a different conclusion. After reviewing the four contradictions in the evidence identified by Holaday, this court cannot conclude that the bankruptcy court's ruling regarding intent is clearly erroneous.

Holaday points to three of contradictions in the evidence that occurred during the course of the trial before the bankruptcy court, all relating to the transfer of funds from the joint accounts. Holaday claims the first instance occurred when the Debtor and Pamela Seay gave conflicting testimony regarding the Debtor's knowledge of the closure of the accounts. The Debtor testified that the decision to close the accounts was Pamela Seay's and that he did not participate in the decision.[10] Pamela Seay testified that she probably discussed transferring the funds with the Debtor.[11]

The second and third contradictions relate to the Debtor's use of the pronoun "we" in relation to who made the decision to move the funds from the joint accounts. Holaday asserts the Debtor lied at trial when he contradicted earlier testimony given at a § 341 meeting of creditors conducted before the panel trustee in which he indicated that both he and Pamela Seay closed the ac-

10. The Debtor testified as follows:

Q. Why were these accounts closed?
A. Why were they closed?
Q. Yeah. Why were they closed?
A. My wife closed them.
Q. I'm sorry?
A. My wife closed them.
Q. Your wife closed them?
A. They were hers, yes.
Q. Was that not a decision of yours to close those accounts?
A. No sir, it was not.
Q. Did you participate in making that decision to close those accounts?
A. No, sir, I did not.
Q. It was absolutely her decision; is that correct?
A. Ask that once again, please.

Q. The decision to close those accounts, was it exclusively your wife's decision?
A. Yes.
[Aplt's App. Vol. 1, Tab T, p. 33, lns. 19–25 and p. 34, lns. 1–12.]

11. Pamela Seay testified as follows:
Q. Why did you remove money from those accounts?
A. I took the money because I felt it was mine.
Q. Did you discuss it with Mr. Seay before making the transfer or removing that money?
A. It was my decision. I may have mentioned it.
Q. Do you recall mentioning to Mr. Seay prior to moving the money discussing it with him?
A. Probably. Yes, I'm sorry.
[Aplt's App. Vol. 1, Tab T, p. 67, lns. 25; p. 68, lns. 1–7.]

counts.[12] Conversely, at trial, the Debtor testified that Pamela Seay closed the accounts without his knowledge. Holaday also draws our attention to the Debtor's testimony before the jury in the state court action three months before the petition date when he indicated that "we" moved approximately $22,000 from the joint accounts.

The Debtor's testimony at trial explained that financial reversals and mounting legal bills caused him to exhaust his share of the couple's joint savings, as well as a substantial portion of Pamela Seay's share, prior to the transfers from the joint accounts. The bankruptcy court concluded that Pamela Seay's transfers from the joint accounts were attempts, after consulting with counsel, to remove what was left of her money from the joint accounts that could have been subject to garnishment, and to place her own money into her own accounts.[13]

■ The Judgment stated that, under Oklahoma law, it was undisputed that funds held in joint tenancy were available to either joint tenant without restriction. In Okla-homa, one joint tenant is presumptively entitled to the entire account. *Baker v. Baker*, 710 P.2d 129, 132–34 (Okla.App.1985) (there is a rebuttable presumption that a judgment debtor who holds an interest in a joint account is entitled to the entire account). The bankruptcy court concluded that either the Debtor or Pamela Seay as joint tenants could have withdrawn any or all funds in the accounts at any time. The bankruptcy court's factual findings that Pamela Seay was entitled to and made the decision to withdraw the funds from the joint accounts, and that the Debtor was not involved in the decision, is supported by the record.

■ Holaday asserts that the fourth contradiction involved the transfer of the assets of APK during the period when the Injunction was in force. The Debtor denied any participation in these actions until confronted with instruments of the transfer at trial, when he admitted that he prepared two of the instruments transferring the assets of APK to Pamela Seay. Holaday urges that the inference to be drawn from this transaction

**12.** The Debtor testified as follows:

Q. Do you remember testifying before the trustee in this case . . .
A. To the trustee?
Q. Yes, Mr. Holbrook?
A. Yes.
Q. 341 hearing?
A. Yes.
. . .
Q. Do you remember this question being asked and these answers given?
"Q. You closed a whole bunch of accounts in October of 1995. Why did you close those accounts?
A. We were just consolidating our banking and trying to pay off some bills and just get everything to clean up, a little confusing."
Do you remember that question being asked and that answer given?
A. I don't remember it specifically, but——
Q. Well, now, you tell the trustee that it was a decision of you and your wife. You say "we." Now, today, you're saying that it was her idea to close the accounts: isn't that true?
A. Yes.
Q. Why were those accounts closed out?
A. You'd have to ask my wife.
Q. Don't you know why those accounts were closed out?
A. It was her money.
Q. Well, your name was on those accounts. You just testified that your name was on those accounts.

A. That's correct.
Q. And you, also, testified that you had the ability to take money out of those accounts and to write checks, isn't that true?
A. That's correct.
[Aplt's App. Vol. 1, Tab T. p. 34, Ins. 13–21; p. 35, Ins. 2–25; and p. 36, Ins. 1–6.]

**13.** Pamela Seay testified as follows:

Q. When you—and I use the term "you", singular, you, personally, when you transferred funds from your various joint accounts into your personal accounts, did you act on the advice of an attorney?
A. Yes, sir.
. . .
Q. Did you have your discussions with Mr. Hanks before the date of transfer, before you transferred, in October 13 when you made the transfers?
A. Yes.
. . .
Q. But what you understood was the order was not effective, did not apply to you?
A. That's correct.
Q. Did not apply to APK?
A. Correct.
Q. Did not apply to Andy Seay? Was that your—
A. That was my understanding, yes, and it was within my right to do what I did.
[Aplt's App. Vol. 1, Tab T, p. 96, Ins. 1–5, 12–25, p. 97, Ins. 1–5.].

is that, if the Debtor participated in the transfer of assets from APK to Pamela Seay on the same day that the joint accounts were closed, then he undoubtedly knew about and affirmatively participated in the decision to transfer money from the joint accounts to Pamela Seay's new accounts.

The bankruptcy court drew a different conclusion from the evidence presented. The Judgment stated that "[a]lthough the testimony is not altogether clear in this regard, it does not appear that debtor and his spouse discussed the matter prior to the closing of the joint accounts." Judgment, p. 6. The bankruptcy court noted that both the Debtor and Pamela Seay were emphatic in their assertions that Pamela Seay's actions were initiated by her alone, which led the bankruptcy court to conclude that at no time did the Debtor suggest, recommend, or condone Pamela Seay's actions. Based on the bankruptcy court's vantage point as the trier of fact, it did not appear that the Debtor and Pamela Seay discussed the matter prior to the transfers. Simply put, the bankruptcy court chose to believe the Debtor and there is nothing in the record to indicate that the bankruptcy court's reliance on this testimony was clearly erroneous.

Holaday also argues the Debtor's alleged violation of the Injunction establishes significant proof of the Debtor's intent to defraud Holaday. According to Holaday, the actions of the Debtor in ignoring, disobeying, or otherwise disregarding an injunction should have been compelling evidence of intent to defraud and contempt of court.

█ Regardless of the legal effect of the Injunction until it was vacated by the state court,[14] the bankruptcy court concluded that Pamela Seay acted alone to transfer the money from the joint accounts and the Debtor did not know of the transfers. The record contains evidence that the Debtor did not violate the Injunction, and that Pamela Seay

acted in a panic to protect her property after she discussed the effect of the Injunction with her attorney. We find no clear error in the bankruptcy court's finding of lack of intent to defraud.

**3. The Bankruptcy Court's Finding that the Debtor Did Not Make a False Oath or that the Oath Related to a Material Fact Sufficient to Deny Discharge Pursuant to § 727(a)(4)(A) was not Clearly Erroneous.**

█ Holaday asserts that the Debtor's listing of his interest in certain accounts on his bankruptcy statements and schedules constituted a false oath. Specifically, Holaday points to the discrepancy between the Debtor's testimony at the state court trial three months prior to the petition date that Holaday's share of the date-of-sale accounts receivable proceeds was still in a joint account, and the Debtor's Schedule B listing an interest in only $11.00 in cash assets. The bankruptcy court concluded that Holaday's evidence, and all logical inferences which may be drawn therefrom, failed to establish that the Debtor made a false oath or account. The bankruptcy court also held that "even if the claimed discrepancies in debtor's petition and schedules were established as having been false, it is this court's view that they are simply not sufficiently material or significant to warrant a determination that debtor should be denied his discharge by reason of them." Judgment, p. 8.

The reviewing court cannot substitute its judgment for the trial court's determination of the facts and cannot reverse unless the findings were clearly erroneous. The Debtor explained that the date-of-sale accounts receivable had been consumed by post-sale business expenses of Edmond Marble. This description was plausible and the bankruptcy court was in the best position to determine the credibility of the witnesses and the evidence.

---

14. Oklahoma civil procedure provides that an injunction may be obtained only after judgment is entered. Okla. Stat. Ann., tit. 12, § 842. Where an action involves more than one claim for relief, a final judgment may not be entered until all are tried except by express direction of the court. Okla. Stat. Ann., tit. 12, § 994. Holaday notes that the substantive law of Oklahoma provides that, where a court has jurisdiction, the

fact that an order may be erroneous, and improvidently granted or irregularly obtained is no excuse for failing to abide by said order. Mere errors in the proceeding in which an order of injunction was granted or irregularities in the form of the injunction order do not constitute justification for disobeying the order of injunction. *Malnar v. Whitfield,* 774 P.2d 1075, 1081 (Okla.App.1989).

The bankruptcy court reached its determination that the Debtor did not possess the necessary intent required to satisfy § 727(a)(2)(A) and § 727(a)(4)(A) after hearing the testimony of both the Debtor and Pamela Seay and observing the demeanor of the witnesses. The four areas of testimony complained of by Holaday are contradictory or confusing, in part, because the questions asked the Debtor did not require precise answers. Therefore, the answers given are subject to reasonable and differing interpretations. The interpretation of the bankruptcy court, and the conclusions drawn from such interpretation, were not clearly erroneous.

## III. CONCLUSION

Based upon the foregoing, this court determines the Summary Judgment Order granting the Debtor's cross-motion for summary judgment on the § 523(a)(4) claim for relief, and the Judgment dismissing the § 727(a)(2)(A) and § 727(a)(4)(A) claims, are AFFIRMED.