227 B.R. 757 (1998)
In re Jerry F. HATLEY, Debtor.
Donald SMOLEN, Plaintiff-Appellant,
v.
Jerry F. HATLEY, Defendant-Appellee.
BAP No. NO-98-047, Bankruptcy No. 97-00985, Adversary No. 97-0204.
United States Bankruptcy Appellate Panel of the Tenth Circuit.
November 19, 1998.
Mark A. Craige, James R. Hicks, Morrel, West, Saffa, Craige & Hicks, Inc., Tulsa, OK, for Plaintiff-Appellant.
H. Gregory Maddux, Maddux & Maddux, Tulsa, OK, for Defendant-Appellee.
Before McFEELEY, Chief Judge, ROBINSON, and MATHESON, Bankruptcy Judges.

OPINION
ROBINSON, Bankruptcy Judge.
Donald Smolen ("Smolen") appeals from the Bankruptcy Court's Memorandum Opinion holding that the debt owed to Smolen by debtor/defendant Jerry Hatley ("Hatley") is dischargeable. Smolen sought to have the debt declared nondischargeable pursuant to 11 U.S.C. § 523(a)(4).[1] For the reasons set forth below, we affirm.
I. Background.
In early 1994, Hatley and Smolen decided to go into business together, buying airplanes to repair, refurbish, and resell. Smolen was to provide the operating capital, supplemented by funds from third party lenders. Hatley, an experienced pilot, was to provide the technical expertise and labor. He was skilled in airplane repairs and had marketing expertise as well. Smolen and Hatley agreed that the proceeds from the sale of a plane would first be used to pay expenses related to the sale, including reimbursement of any funds advanced by Smolen or Hatley, with any net profit or loss to be divided equally between them.
On April 12, 1994, Hatley formed a corporation called Casa Blanca Aviation, Inc. ("Casa Blanca"). There were never any shares of stock in Casa Blanca issued, no initial or annual shareholders meetings conducted, no initial or annual directors meetings *759 held, no directors or officers elected, and no corporate books or other accounting records kept. The parties agree that the business was never run as a corporation. The primary reason Casa Blanca was formed was to obtain a state tax permit for buying and selling planes, that would allow them to avoid paying a state levied transfer tax on the purchase and sale of planes. The two planes involved in this dispute were titled in the name of the corporation, and the state tax license for buying and selling the subject plane was held in the name of the corporation. A franchise tax return was prepared by the corporation.
Hatley and Smolen borrowed $45,000.00 from United Bank in Oklahoma City, Oklahoma, on May 23, 1994. The proceeds from this loan were used to purchase the first plane, a Cessna 421 (the "421"). The 421 was then refurbished and sold for $48,000.00 cash and a 1974 Piper Aztec plane (the "Aztec") in trade. The Aztec was eventually refurbished and sold for $75,000.00 cash on or about June 11, 1995. Total receipts from the sale of the 421 and the Aztec (the "Planes") equaled $125,000.00.[2] No other planes were purchased or sold. All funds used to purchase the Planes and to pay the costs of repair and refurbishment came: from the United Bank loan; from proceeds of the sales of the planes; or from Smolen personally.
The $125,000.00 in sales proceeds were deposited into Hatley's personal bank account. The parties stipulated "that Smolen knew that deposits and payments were all made from Hatley's personal account" and the Bankruptcy Court found that "Smolen knew that deposits and payments with respect to the Planes were to be made to and from Hatley's personal account." From said account, Hatley paid Smolen, vendors, and United Bank a total of $80,395.75.[3] Hatley used the remaining $44,604.28 for personal expenditures. The parties stipulated that Hatley owes a debt to Smolen in this amount, $44,604.28. Hatley never made any payments on this debt to Smolen. On or about March 1, 1996, Hatley prepared and executed a promissory note to Smolen in the sum of $57,809.69, which Smolen testified he never accepted.
The Bankruptcy Court found that the parties had agreed that the business was never operated as a corporation but that the corporation was merely formed for tax purposes. Hatley argued that the business was a joint venture, while Smolen argued that it was a partnership. The Bankruptcy Court found that Hatley and Smolen were partners, and that it was inconsequential whether the business was a joint venture or a partnership, since partners and joint venturers are held to the same duty in their dealings with one another. Oklahoma Co. v. O'Neil, 440 P.2d 978, 984 (Okla.1968).
The partners in this case did not have an express, written agreement that could establish the necessary fiduciary relationship. The Bankruptcy Court relied on Fowler Bros. v. Young (In re Young), 91 F.3d 1367 (10th Cir.1996), and Holaday v. Seay (In re Seay), 215 B.R. 780 (10th Cir. BAP 1997), in finding that neither Oklahoma common law nor Oklahoma statutory law, i.e., the Oklahoma Uniform Partnership Act, imposes the fiduciary duty required under § 523(a)(4). In light of the Bankruptcy Court's finding that a fiduciary relationship did not exist within the meaning of § 523(a)(4), the Court did not need to reach the issue of defalcation.
II. Jurisdiction and Standard of Review.
A Bankruptcy Appellate Panel, with the consent of the parties, has jurisdiction to *760 hear appeals from final judgments, orders, and decrees of bankruptcy judges in this circuit. 28 U.S.C.A. § 158(a), (b)(1), (c)(1). As neither party has opted to have this appeal heard by the District Court for the Northern District of Oklahoma, they are deemed to have consented to jurisdiction. 10th Cir. BAP L.R. 8001-1(d).
We review the Bankruptcy Court's conclusions of law de novo. Tulsa Energy, Inc. v. KPL Prod. Co. (In re Tulsa Energy, Inc.), 111 F.3d 88, 89 (10th Cir.1997). The Bankruptcy Court's findings of fact will be rejected only if clearly erroneous. Id.
III. Discussion.
Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity." The creditor has the burden of proving by a preponderance of the evidence that (1) a fiduciary relationship existed between the debtor and creditor, and that (2) fraud or defalcation was committed by the debtor in the course of that fiduciary relationship. Fowler Bros., 91 F.3d at 1371.
In this case, the partners did not have an express, written agreement that could establish the necessary fiduciary relationship.[4] The Tenth Circuit Bankruptcy Appellate Panel has previously addressed the issue of whether Oklahoma statutory or common law creates a fiduciary relationship between partners sufficient to satisfy § 523(a)(4). In In re Seay, the Court found that neither Oklahoma common law nor the Oklahoma version of the Uniform Partnership Act (UPA) impose a trust relationship sufficient to satisfy § 523(a)(4). Seay, 215 B.R. at 786-87.
Smolen argues that the case law from non-bankruptcy courts in Oklahoma clearly establishes that there is a fiduciary duty between partners. In Seay, the Court acknowledged that the Oklahoma bankruptcy courts in Susi v. Mailath (In re Mailath), 108 B.R. 290 (Bankr.N.D.Okla.1989), and Tindale v. Blatnik (In re Blatnik), 101 B.R. 718 (Bankr. E.D.Okla.1989), found that an Oklahoma common law duty of utmost good faith between partners creates a fiduciary relationship between partners sufficient for purposes of § 523(a)(4). Seay, 215 B.R. at 787. The Court noted that these decisions are at odds with Tway v. Tway (In re Tway), 161 B.R. 274 (Bankr.W.D.Okla.1993), which was decided prior to Fowler Bros. However, the Court in Seay held that the Tenth Circuit's decision in Fowler Bros., which the prior decision in Tway is consistent with, was the most recent and controlling decision regarding the sufficiency of a trust relationship for purposes of § 523(a)(4). Id. In Fowler Bros., the Tenth Circuit held that "`[n]either a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability.'" Id. (quoting Fowler Bros., 91 F.3d at 1372).
Smolen argues that Oklahoma's adoption of the Revised Uniform Partnership Act ("RUPA") in 1997 codified this common law rule. Although the RUPA does not apply in this case (it was adopted after the partnership in this case was formed), Smolen argues that it demonstrates the codification of the common law existence of a fiduciary duty among partners as well as between the individual partners and the partnership. In support, Smolen cites the following provision in Oklahoma's RUPA:
General Standards of Partner's Conduct. (a) The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections (b) and (c) of this section.
(b) A partner's duty of loyalty to the partnership and the other partners is limited to the following:

*761 (1) to account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity. . . .
54 Okl. St. Ann. § 1-404(b)(1). The corresponding provision in Oklahoma's UPA, which applies in this case, provides that:
Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.
54 Okl. St. Ann. § 221(1). In Seay, the Court noted that the UPA provision does not create the kind of fiduciary relationship required by § 523(a)(4). Seay, 215 B.R. at 786. Rather, the provision only creates a trust after the partners derive profits without the consent of the partnership, and the trust created is therefore the sort of trust ex maleficio which is not sufficient for § 523(a)(4). Id. at n. 4 (citing Medved v. Novak (In re Novak), 97 B.R. 47, 59 (Bankr.D.Kan.1987)). Although the provision in the RUPA omits the language referring to profits derived "without the consent of the other partners," § 1-404 still limits the duty to account to the partnership. It requires a partner to account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner. Thus, the RUPA does not extend the duty to individual partners, and any such extension must come from legislation.
Appellant argues that the holding in Seay is wrong. However, our decision is dictated by the principle that we are bound by prior panel decisions. A panel cannot overrule the judgment of another panel of the court. Starzynski v. Sequoia Forest Indus., 72 F.3d 816, 819 (10th Cir.1995). See Ute Indian Tribe v. Utah, 114 F.3d 1513, 1525 (10th Cir.1997) ("[U]niform decision-making within each circuit is essential."), cert. denied, ___ U.S. ___, 118 S.Ct. 1034, 140 L.Ed.2d 101 (1998); Ball v. Payco-General Am. Credits, Inc. (In re Ball), 185 B.R. 595, 597 (9th Cir. BAP 1995) ("We will not overrule our prior rulings unless a Ninth Circuit Court of Appeals decision, Supreme Court decision or subsequent legislation has undermined those rulings.") Accordingly, Seay is controlling.
Appellant also cites Arnett v. Weiner (In re Weiner), 95 B.R. 204 (Bankr.D.Kan.1989), for the proposition that even if the UPA alone did not create a fiduciary duty, the presence of additional facts may give rise to such. In Weiner, after holding that the UPA was insufficient to create a fiduciary relationship, the court noted that "although partners are not ordinarily fiduciaries, if there are some additional facts in a particular case that evidence the existence of an express or technical trust, then the courts can find that this particular partner is a fiduciary within the meaning of section 523(a)(4)." Weiner, 95 B.R. at 207. In Weiner, the court found such additional facts. There the debtor held himself out to the other partners as both a licensed attorney and a certified public accountant. The debtor was the sole managing partner through his title of "Administrative Partner" or "Tax Matters Partner," and had all the responsibilities that are commonly associated with a trustee, including those of collecting, segregating, investing, dispersing, and accounting for the funds. Id. Moreover, there was a partnership agreement that set out the debtor's duties, as "Administrative Partner" and "Tax Matters Partner," to administer and to manage the partnership on behalf of the other partners. Id. at 204-05.
In this case, Smolen and Hatley did not have an express, written agreement that could establish the necessary fiduciary relationship. Smolen argues that sufficient additional facts exist to establish that Hatley was a fiduciary. Hatley is a licensed attorney and had the sole responsibility for handling all of the money. Hatley had all of the responsibilities associated with a trustee, including collecting, segregating, making all of the investment decisions, dispersing, and accounting for the funds. On the other hand, Smolen argues that the Bankruptcy Court erred in finding that Smolen knew that deposits and payments were to be made to and *762 from Hatley's personal account. Smolen alleges that this fact is clearly erroneous based on the following uncontroverted testimony of Smolen during the March 19, 1998 trial:
A. . . . I was upset with him (Hatley) that he put the money into his own account and I told him that. I said we're not going to ever do that again and he assured me the next time he would tell me about everything beforehand. I said this is my money, it goes into my accounts. If you have anything coming, if we make a profit, you'll get half the profit.
Aplt.App. At 20, Page 12, lines 9 to 15.
A. . . . You know, I would see him in court probably two-three time a week. He would give me the invoices, I would pay those invoices directly.
Aplt.App. At 20, Page 13, lines 1 to 4.
Q. What about on the second airplane?
A. Okay. I was not aware of the sale of the second airplane. Now, this is all hindsight after we've gone through discovery. But apparently Hatley sold the second airplane on June 11th of 1995 unbeknownst to me. My wife kept saying she had a bad feeling about what was going on. And I was continuously asking Hatley where is the plane, what are you doing with the plane. He would tell me it was in Cincinnati being tried. It was in Miami, you know, Florida. You know, had all these prospective buyers. Okay. And this was through the summer months of '95. Finally, I confronted him and he said I need to talk to you and I said you sure do. And we went downstairs in the lunch room of the Workers' Compensation Court. This was on September the 18th of 1995. At that time he looked at me and says I've sold the plane. I've taken the money. And I looked at him and I said, Jerry, that's the kind of thing that people go to prison for, said, what in the world are you doing. And at that time he just kind of basically spilled his guts and admitted to me that he hadn't received 40,000 on the sale of the first plane, that it was 50,000 and that he had taken that, you know, the difference on the sale of the first plane.
Aplt.App. At 20, Page 13, line 11 to Page 14, line 9.
The parties stipulated "that Smolen knew that deposits and payments were all made from Hatley's personal account," and the Bankruptcy Court found that "Smolen knew that deposits and payments with respect to the Planes were to be made to and from Hatley's personal account." The Bankruptcy Court's finding that Smolen knew that deposits and payments "were to be made" to and from Hatley's personal account suggests that Smolen consented to the use of Hatley's personal accounts. However, Smolen is arguing, and the quoted testimony suggests, that Smolen did not consent to Hatley's use of his personal account nor to his taking action without consulting with Smolen up front. For this reason, this case is distinguishable from Weiner. Smolen's testimony establishes that Hatley acted without Smolen's consent. Smolen found out that Hatley was using his personal accounts after the fact, and told Hatley that they "were not going to ever do that again."
Although Oklahoma's UPA speaks in terms of deriving profits without the consent of the other partners, we have already noted that the provision only creates a trust after the partners derive profits without the consent of the partnership, and the trust created is therefore the sort of trust ex maleficio that is not sufficient for § 523(a)(4).
IV. Conclusion.
The Bankruptcy Court's Memorandum Opinion declaring the debt from Hatley to Smolen dischargeable is AFFIRMED.
NOTES
[] After examining the briefs and appellate record, the Court has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed.R.Bankr.P. 8012; 10th Cir. BAP L.R. 8012-1(a). The case is therefore ordered submitted without oral argument.
[1] Future references are to Title 11 of the United States Code unless otherwise noted.
[2] The parties stipulated that the gross receipts from the sale of the Planes totaled $125,000, notwithstanding that they also stipulated to the sale price of $48,000 for the 421, and $75,000 for the Aztec, which total $123,000. See Adversary Docket No. 24 at p. 2. The Bankruptcy Court noted that given the ruling of the Court, and the fact that the parties stipulated to the amount owed by Hatley to Smolen, the inconsistency as to the amount received for the Planes is of no consequence.
[3] The claims of United Bank and the vendors were paid in full. The United Bank loan was repaid in part from the sale of the 421; the remaining balance of principal and interest was paid by Smolen. Hatley did not use any of his own money to pay vendors, United Bank or Smolen.
[4] Smolen argues for the first time on appeal that an express trust was created by an oral agreement of the parties when Hatley agreed that he would not convert the funds derived from the sale of the second airplane. The argument that an express trust was created by agreement of the parties was not raised before the trial court and thus is not timely. An appellate court should not consider new issues not properly raised before the court below. Zeigler Eng'g Sales, Inc. v. Cozad (In re Cozad), 208 B.R. 495, 498 (10th Cir. BAP 1997).